APPORTIONMENT OF WAYNE COUNTY BOARD OF
COMMISSIONERS—1982

APPORTIONMENT OF INGHAM COUNTY BOARD OF
COMMISSIONERS—1982

Docket Nos. 69146, 69155. Argued April 20, 1982 (Calendar Nos. 1, 2).
—Decided May 5, 1982.

The Wayne County Apportionment Commission (WCAC), after
receiving the official figures of population of the 1980 decennial
United States census, adopted one of several proposed plans to
apportion the county commissioner districts. Thereafter, peti-
tions were filed in the Court of Appeals by certain citizens of
the cities of Dearborn, Dearborn Heights, and Westland, alleg-
ing that the plan adopted was violative of statutory guidelines,
that partisan political considerations were involved, and that
further study by the WCAC would produce a better plan.
Following the WCAC's response, the Court of Appeals, R. B.
Burns, P.J., and T. M. Burns and Allen, JJ., held that the
WCAC's apportionment plan was void for failing to meet the
requirements of the law and that the plan showed a lack of
good-faith effort to achieve districts of equal population. The
cause was remanded to the WCAC with express instructions to
modify the plan or to adopt a new plan for review by the Court
of Appeals (Docket Nos. 62576, 62577). The WCAC applies for
leave to appeal.

The Ingham County Apportionment Commission (ICAC) similarly
adopted a plan to apportion its commissioner districts. In all,
13 plans were submitted. All had a zero population deviation
among the districts; however, the plans differed in the degree to
which they adhered to the remaining statutory guidelines. A
petition was filed in the Court of Appeals by a citizen of East

REFERENCES FOR POINTS IN HEADNOTES

[1, 3-5] 25 Am Jur 2d, Elections § 19.

[2] 25 Am Jur 2d, Elections § 31.

Inequalities in population of election districts or voting districts as
rendering apportionment unconstitutional—federal cases. 12 L Ed
2d 1282.

[6] 25 Am Jur 2d, Elections § 32.

Lansing, alleging that the plan adopted violated certain of the guidelines and that it compared unfavorably with other plans, and requesting that the Court order the ICAC to adopt a new plan or approve the plan among those submitted which best conforms to the requirements of law. Following the ICAC's response, the Court of Appeals, R. B. Burns, P.J., and T. M. Burns and Allen, JJ., held that the ICAC's plan of apportionment, while it achieved mathematical exactness, was void for violating the subsidiary statutory guidelines and remanded the cause to the ICAC with express instructions to adopt a new plan and to submit it to the Court (Docket No. 62911). The ICAC applies for leave to appeal.

In an opinion per curiam signed by Chief Justice Coleman and Justices Kavanagh, Levin, and Fitzgerald, the Supreme Court *held:*

The judgments of the Court of Appeals remanding to the apportionment commissions are affirmed. The Court did not, however, agree with the reasoning of the Court of Appeals.

An apportionment plan for a county board of commissioners must be drawn both to preserve city and township boundary lines and to accord with other statutory apportionment guidelines to the extent possible without violating equal protection guarantees of the United States Constitution.

1. The power of the Legislature to provide for representation on county boards of commissioners is limited by the state constitutional scheme of township and city representation. The framers of the constitution, and the people in approving it, did not intend that the one person-one vote concept would be implemented in establishing county boards. Rather, the scheme of representation was that the districts represented would be townships and cities, and that the persons who would constitute the board of supervisors would ordinarily be those who had been elected as supervisors of townships and as officials of city government or who would be designated or appointed by those who had been elected. Legislation under the Constitution of 1908 allowing election of a city's representatives to the board of supervisors was, in effect, given constitutional approval when the 1908 constitutional provision was carried forward into the Constitution of 1963, and therefore it does not appear that the concept that representatives on the board would be the heads of the constituent political subdivisions has the status of a constitutional requirement. The Legislature was free, except as to townships, to provide for direct election by the people of the members of the board, but it was not free, under the Constitution of 1963, to provide for the establishment of election dis-

tricts having boundary lines that do not follow the boundary lines of townships or cities.

2. The invalidity under the federal constitution of the provision for one representative on the board from each township poses the question whether the constitutional scheme of township and city representation in county boards is severable. To hold that the Legislature is free to abandon the scheme of township and city representation in county boards would be to relieve the Legislature of a limitation on its power which has existed since 1850. A decision that the scheme is severable enforces the same value which the Court perceived in holding the state legislative apportionment provisions not severable, that of not enlarging the power of the Legislature without a vote of the people. The Court therefore holds that the Legislature cannot provide for representation on the board of commissioners other than from townships and cities except to the extent required by the Equal Protection Clause of the Fourteenth Amendment as elucidated by the Supreme Court of the United States. The concept of one person-one vote is not embodied in the Equal Protection Clause of the state constitution and is inconsistent with the constitutional scheme of county government. The original scope of the state constitution's Equal Protection Clause is not changed because of the invalidity of some of those constitutional provisions.

3. Both the statute concerning charter counties and that concerning non-charter counties require that county commissioner district lines be drawn to preserve city and township lines, and that townships, villages, cities, and precincts shall be divided only if necessary to meet the population standard. The statutory guidelines for apportionment of boards of commissioners in non-charter counties cannot be read to require a rigid, exhaustive compliance with each criterion in the order set forth by the statute before proceeding to the next. Such a reading would render some of the succeeding criteria ineffective and would violate the constitutional scheme of city and township representation. The guidelines, rather, require that commissioner districts be drawn to preserve township, village, city, and precinct boundary lines to the extent possible without exceeding the range of allowable divergence for population equality under the federal constitution, 11.9% until the Supreme Court of the United States declares otherwise, at the least cost to the federal principle of equal population between election districts consistent with the maximum preservation of such lines. Between two or more plans which comply with that

standard, compactness and squareness in shape to the extent practicable shall govern.

4. Good-faith effort on the part of a county apportionment commission in drawing commissioner districts, alone, will not automatically enable a plan to survive a challenge. A reasonable choice in the reasoned exercise of judgment ordinarily should be sustained. However, the plan must be in accord with the requirements of the federal and state constitutions and applicable statutes.

Justice Moody, joined by Justices Williams and Ryan, dissenting in part, would hold that the Court of Appeals erred in the case of Wayne County, but that error has not been demonstrated in the Ingham County case, although the order of the Court of Appeals, in some of its requirements, encroached on the actions of a quasi-legislative body.

1. The Legislature is not bound to provide for the establishment of county commissioner election districts which preserve city and township boundary lines. The provision of the state constitution which required boards of commissioners in organized counties to consist of one member from each township within the county is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. The purported scheme for representation cannot remain without the words of the state constitutional provision; it is inseparable from the invalid allotment of one member to each township. The Legislature, in enacting statutes for the apportionment of charter and non-charter counties, filled the void left by the unconstitutionality of the provision for one member of the board from each township. Furthermore, the Constitution of 1963 specifically grants the Legislature the authority to provide for the powers of counties. In addition, it made a significant break with the historical scheme of township and city representation as political units on county boards in permitting the Legislature to draft procedures for county home rule and in providing that the law may permit the organization of county government in form different from that set forth in the constitution. The Legislature is free to design any system of apportionment as long as it does not run afoul of the Equal Protection Clause of the federal constitution. The Legislature has provided guidelines for apportionment of organized counties which require county apportionment commissions to be governed by the criteria in their stated order of importance. Under the guidelines, equality of population is to be the controlling consideration in apportionment of commissioner districts, but the remaining guidelines are also to be considered and followed without

excluding any, observing the stated order. After rearranging the stated order of the criteria so as to give political boundary lines primacy, the Court concludes that apportionment commissions are free to adopt plans which deviate from population equality to preserve the inviolability of the boundaries so long as the deviation does not exceed 11.9%. Such a standard, which developed out of fact situations different from those presented by these cases, need not and should not be set. Each case should be examined on its facts. Although in the hierarchy of the guidelines the consideration of establishing districts as nearly of equal population as is practicable is given primacy, that is not to say that the other criteria need be consulted only after an apportionment plan attains zero population deviation. The standard to be applied by the Court of Appeals in reviewing an apportionment plan is whether an apportionment commission made an honest and good-faith effort to comply with the statutory guidelines.

2. Upon the filing of a petition for review of a county apportionment plan, the Court of Appeals must ascertain whether the plan meets the requirements of the laws of the state. Where it determines that a plan fails to adhere to statutory mandates or constitutional requirements, it cannot approve the plan. The Court of Appeals has said that the laws of the state require that an apportionment plan provide for zero deviation among commissioner districts before it may be examined for compliance with the other statutory guidelines. The concept of absolute equality noted in earlier federal cases has been revised by subsequent case law. The Supreme Court of the United States has held that the states are permitted flexibility in state legislative apportionment and that a rational state policy could justify minor deviations from precise equality. Absolute equality is not required by the federal or state constitutions. Nor did the Legislature, in enacting the apportionment guidelines, intend that equality should apply to the exclusion of the other criteria. The phrase "as nearly of equal population as is practicable" does not mean mathematical equality. The Court of Appeals erred in rejecting the WCAC plan on the ground that it did not achieve absolute mathematical equality among commissioner districts.

3. The statutory apportionment guidelines state only that the Court of Appeals, in reviewing a plan adopted by an apportionment commission, must determine whether the plan meets the requirements of the laws of the state. The Court of Appeals has adopted a standard of review which would require a commis-

sion to adopt the plan which *best* meets the requirements of the apportionment guidelines after achieving mathematical equality. Such a standard leaves little discretion in an apportionment commission. Although the record must support the conclusion that a commission followed the apportionment guidelines in adopting a plan, the Legislature did not intend to so limit the discretion of a commission. The standard to be followed should be whether the plan adopted demonstrates an honest and good-faith effort to comply with the criteria.

4. A comparative analysis of the plans seriously considered by the WCAC demonstrates that the WCAC considered all the guidelines in their stated order of importance and made an honest and good-faith effort to select the plan which adhered to those criteria. Thus, the plan adopted by the WCAC meets the requirements of the laws of the state, and the judgment of the Court of Appeals in the WCAC case should be reversed.

5. The plan adopted by the ICAC, while adhering to absolute mathematical equality, does not demonstrate that the commission gave adequate consideration to the other guidelines. Compared to three other plans considered by the ICAC, the plan adopted was the worst or equal to the worst plan. It did not demonstrate an honest and good-faith effort to comply with the guidelines. The Court of Appeals did not err in requiring the ICAC to choose its board size at its first meeting, to adopt and submit a new plan within ten days, and to submit copies of all plans considered, but it did err in requiring a vote on all plans submitted and in requiring reasons for each commissioner's vote. Such requirements are unnecessary and unwise encroachments upon the actions of a quasi-legislative body.

Justice Williams concurred with Justice Moody because of the compelling necessity of urgent decision in order to accommodate the election time schedule, but reserved the right to submit a later opinion expanding his views.

OPINION OF THE COURT

1. COUNTIES — APPORTIONMENT — STATUTES — GUIDELINES — CONSTITUTIONAL LAW.

A plan of apportionment of county commissioner districts must both preserve city and township boundary lines and be in accord with other statutory guidelines and the requirements of the federal and state constitutions (US Const, Am XIV; Const 1963, art 1, § 2, art 7, §§ 2, 7; MCL 45.505, 45.514, 46.401, 46.404; MSA 5.302[5], 5.302[14], 5.359[1], 5.359[4]).

2. Constitutional Law — Counties — Apportionment — Equal
   Protection.

   The Constitution of 1963 provides for a scheme of county govern-
   ment requiring representation of townships and cities on
   county boards of commissioners which is inconsistent with the
   concept of one person-one vote; the scope of the state Equal
   Protection Clause is consistent with this scheme of county
   government and was not expanded to include the one person-
   one vote concept upon the invalidation of the constitutional
   provision giving each township one representative on the board
   by a decision of the Supreme Court of the United States;
   therefore, the Legislature cannot provide for representation on
   county boards of commissioners other than from township and
   city districts except to the extent required by the Equal Protec-
   tion Clause of the United States Constitution (US Const, Am
   XIV; Const 1963, art 1, § 2, art 7, §§ 2, 7; MCL 45.505, 45.514,
   46.401, 46.404; MSA 5.302[5], 5.302[14], 5.359[1], 5.359[4]).

3. Counties — Apportionment — Statutes — Guidelines — Consti-
   tutional Law.

   The statutory guidelines for apportionment of county commis-
   sioner districts require that district lines be drawn to preserve
   township, village, city, and precinct boundary lines consistent
   with the range of allowable divergence from the federal goal of
   population equality; a rigid, exhaustive adherence to the order
   in which the criteria are presented by the statute so as to
   render satisfaction of one criterion necessary prior to proceed-
   ing to the next is not required (US Const, Am XIV; MCL
   46.404; MSA 5.359[4]).

   Opinion by Blair Moody, Jr., J.

4. Counties — Apportionment — Equal Protection.

   *The Legislature is not bound to provide for establishment of
   county commissioner election districts which preserve city and
   township boundary lines; the constitutional provision requiring
   boards of commissioners in organized counties to be comprised
   of one member from each township is unconstitutional under
   the federal Equal Protection Clause, and the rest of the provi-
   sion is inseparable (US Const, Am XIV; Const 1963, art 7, § 7).*

5. Counties — Apportionment — Population Equality — Statutes
   — Guidelines.

   *The statutory guidelines for apportionment of county commis-
   sioner districts, while stated in the order of their importance,
   need not be applied so as to require absolute mathematical*

*population equality among the districts as a prerequisite for consideration of the other criteria; neither the federal nor the state constitution requires such equality, nor was that application intended by the Legislature (MCL 46.404; MSA 5.359[4]).*

6. COUNTIES — APPORTIONMENT — APPEAL — STANDARD OF REVIEW.

*The standard to be applied by the Court of Appeals in reviewing a county apportionment plan should not be whether the plan adopted best meets the apportionment guidelines, but whether the plan demonstrates an honest and good-faith effort on the part of the apportionment commission to comply with the guidelines (MCL 46.404, 46.406; MSA 5.359[4], 5.359[6]).*

*Wayne County:*

*Bokos, Jones & Plakas, P.C.* (by *Dale A. Jurcisin),* for petitioner Justine Barns.

*Rock & Borgelt, P.C.* (by *Patrick Carmody, Jr.),* for petitioner Donald Bishop.

*William Hultgren,* Dearborn Corporation Counsel, for petitioner John B. Reilly.

*William L. Cahalan,* Prosecuting Attorney, and *Don W. Atkins,* Assistant Prosecuting Attorney, for Wayne County Apportionment Commission.

*Ingham County:*

*Sinas, Dramis, Brake, Boughton, McIntyre & Reisig, P.C.* (by *Donald L. Reisig)* and *E. Spencer Abraham,* for petitioner Jane Schoneman.

*Cohl, Salstrom & Stoker, P.C.* (by *Peter A. Cohl* and *Larry A. Salstrom),* for Ingham County Apportionment Commission.

PER CURIAM. The question presented concerns the apportionment of county boards of commissioners.

The Court of Appeals declined to approve a

Wayne County plan and remanded to the Wayne apportionment commission on the ground that it had failed to make a "good-faith effort to achieve districts of equal population". The Court also declined to approve an Ingham County plan and remanded to the Ingham apportionment commission on the ground that "once mathematical exactness in population is achieved", the subsidiary guidelines apply and the apportionment commission had selected a plan which "mathematically violated the subsidiary guidelines" "more than other plans before the commission".

We affirm the judgments of the Court of Appeals remanding to the Wayne and Ingham apportionment commissions for the drawing of plans in conformity with constitutional and statutory requirements. We do not, however, agree with the reasoning of the Court of Appeals.

An apportionment plan for a county board of commissioners must both preserve city and township boundary lines and be drawn in accordance with other statutory criteria (1966 PA 261, 293)[1] to the extent this can be done without violating the Equal Protection Clause of the federal constitution as elucidated in the decisions of the United States Supreme Court.

I

The 1963 Constitution provides (article 7, § 7) for the establishment in each organized county of a board of supervisors, now the board of commissioners, "consisting of one member from each organized township and such representation from cities as provided by law".[2]

---

[1] MCL 46.401, 46.404; MSA 5.359(1), 5.359(4); MCL 45.505, 45.514; MSA 5.302(5), 5.302(14). See fns 6, 8 and 9 for text.

[2] "A board of supervisors shall be established in each organized

The constitution also provides (article 7, § 2) for the establishment, with the approval of a majority of a county's electorate, of charter counties "with powers and limitations to be provided by general law", and that such "law may permit the organization of county government in form different from that set forth in this constitution".[3]

The voters of Wayne County have approved a charter which becomes effective on January 1, 1983. We have considered whether the apportionment of Wayne County is governed by the provision of the constitution (article 7, § 7) concerning counties generally or by the provision authorizing charter counties (article 7, § 2) and whether the general apportionment statute (Act 261) or the one concerning charter counties (Act 293) applies. Our conclusion that the apportionment of board of commissioner election districts for counties generally and for charter counties is governed by essentially the same criteria will ordinarily mean that

county consisting of one member from each organized township and such representation from cities as provided by law." Const 1963, art 7, § 7.

[3] "Any county may frame, adopt, amend or repeal a county charter in a manner and with powers and limitations to be provided by general law, which shall among other things provide for the election of a charter commission. The law may permit the organization of county government in form different from that set forth in this constitution and shall limit the rate of ad valorem property taxation for county purposes, and restrict the powers of charter counties to borrow money and contract debts. Each charter county is hereby granted power to levy other taxes for county purposes subject to limitations and prohibitions set forth in this constitution or law. Subject to law, a county charter may authorize the county through its regularly constituted authority to adopt resolutions and ordinances relating to its concerns.

"The board of supervisors by a majority vote of its members may, and upon petition of five percent of the electors shall, place upon the ballot the question of electing a commission to frame a charter.

"No county charter shall be adopted, amended or repealed until approved by a majority of electors voting on the question." Const 1963, art 7, § 2.

whether § 7 or § 2 of article 7 of the constitution or Act 261 or Act 293 applies is not determinative.

## A

In *Brouwer v Kent County Clerk,* 377 Mich 616, 659; 141 NW2d 98 (1966), an equally divided Court affirmed a decision of the circuit court declaring article 7, § 7 violative of the Equal Protection Clause of the Fourteenth Amendment. The lead opinion said "that article 7, § 7 is invalid because it requires every township to be represented on its [the county's] board of supervisors by one member and only one regardless of the population of the township". The Court did not prescribe a remedy. Jurisdiction was retained.[4] A legislative solution was awaited.

Three months after *Brouwer* was decided, Act 261 was enacted.[5] Act 261 provides for the apportionment of county boards of commissioners by the establishment of commissioner districts "as nearly of equal population as is practicable".[6] Act 261

[4] The reporter's note to the opinions of the Justices (377 Mich 621), describing the nature of the action, the proceedings in the trial court and the disposition by this Court, states: "Affirmed by an equally divided court, but with jurisdiction retained by the Supreme Court."

The reporter's note also states that the case was decided "April 5 and 6, 1966". A supplemental memorandum was filed by one of the Justices on April 6.

[5] Legislation addressing the subject matter was introduced on April 14, 1965. A bill had passed the House before *Brouwer* was decided. An amended Senate bill was approved and returned to the House on April 14, 1966, shortly after *Brouwer* was decided on April 5 and 6, 1966.

1966 PA 261 was approved on July 12, 1966, but without immediate effect. It became effective on March 10, 1967.

[6] "[T]he county apportionment commission in each county of this state shall apportion the county into not less than 5 nor more than 35 county commissioner districts as nearly of equal population as is practicable and within the limitations of section 2." MCL 46.401; MSA 5.359(1). (As amended by 1969 PA 137.)

further provides for the establishment of a county apportionment commission[7] and that such a commission "shall be governed by the following guidelines in the stated order of importance:"

(a) all districts shall be single member districts "as nearly of equal population as is practicable";

(b) "contiguous";

(c) "compact and of as nearly square shape as is practicable"; .

(d) townships shall not be combined with cities unless, and (e) townships, villages and cities and (f) precincts shall not be divided unless, "necessary" "to meet the population standard";

(g) residents of state institutions who cannot vote are to be excluded in drawing districts;

(h) districts "shall not be drawn to effect partisan political advantage".[8]

---

Section 2 provides for the number of commissioners; not more than 21 for a county (like Ingham) with a population of 50,001 to 600,000, and 25 to 35 for a county (like Wayne) with a population over 600,000. MCL 46.402; MSA 5.359(2).

[7] MCL 46.403; MSA 5.359(3).

[8] "In apportioning the county into commissioner districts, the county apportionment commission shall be governed by the following guidelines in the stated order of importance:

"(a) All districts shall be single-member districts and as nearly of equal population as is practicable. The latest official published figures of the United States official census shall be used in this determination, except that in cases requiring division of official census units to meet the population standard, an actual population count may be used to make such division. Other governmental census figures of total population may be used if taken subsequent to the last decennial United States census and the United States census figures are not adequate for the purposes of this act. The secretary of state shall furnish the latest official published figures to the county apportionment commissions forthwith upon this act taking effect, and within 15 days after publication of subsequent United States official census figures.

A few days after Act 261 was enacted, the charter county enabling act (Act 293) was enacted. Act 293 parallels Act 261, but does not provide that apportionment shall be governed by guidelines with a stated "order of importance". Act 293 provides that each city and township shall be apportioned so that it has "the largest possible number of complete districts within its boundaries before any part of the city or township is joined" with other territory, all districts shall be single-member districts "as equal in population as practicable", contiguous, "compact and as nearly square in shape as is practicable", and "shall be drawn without regard to partisan political advantage", and that "[t]ownships, villages, cities and precincts shall be divided only if necessary to meet the population standard".[9]

"A contract may be entered into with the United States census bureau to make any special census if the latest United States decennial census figures are not adequate.

"(b) All districts shall be contiguous.

"(c) All districts shall be as compact and of as nearly square shape as is practicable, depending on the geography of the county area involved.

"(d) No township or part thereof shall be combined with any city or part thereof for a single district, unless such combination is needed to meet the population standard.

"(e) Townships, villages and cities shall be divided only if necessary to meet the population standard.

"(f) Precincts shall be divided only if necessary to meet the population standard.

"(g) Residents of state institutions who cannot by law register in the county as electors shall be excluded from any consideration of representation.

"(h) Districts shall not be drawn to effect partisan political advantage." MCL 46.404; MSA 5.359(4).

The foregoing reflects amendments made by 1969 PA 137.

[9] "Sec. 14. A county charter adopted under the provisions of this act shall provide for all of the following:

*   *   *

"(b) * * * The charter shall also provide for the partisan election of members of the legislative body from single member districts to be established by the county apportionment commission as created in

## B

When this Court decided *Brouwer,* it was unclear whether *Reynolds v Sims,* 377 US 533; 84 S

---

section 5 and pursuant to the standards and guidelines established in section 5(2), (4), (5), (6), (7), and (8) for reapportionment based upon the last official federal decennial census, effective at the first regular general election of the members of the legislative body occurring not less than 12 months after the completion and certification of the federal census. Each city and township shall be apportioned so that it has the largest possible number of complete districts within its boundaries before any part of the city or township is joined to territory outside the boundaries of the city or township to form a district." MCL 45.514; MSA 5.302(14).

"Sec. 5. * * *

"(2) The county apportionment commission, within 30 days after the adoption of the resolution by the county board of commissioners, shall establish charter commission districts equal to the number of charter commissioners to be elected. All districts shall be single member districts and as equal in population as practicable. The latest official published figures of the United States official census shall be used in this determination, except that in cases requiring a division of official census units to meet the population standard, an actual population count may be used to make the division. Other governmental census figures of total population may be used if taken after the last decennial United States census and the United States census figures are not adequate for the purposes of this act. The secretary of state shall furnish the latest official published figures to the county apportionment commission within 15 days after publication of subsequent United States official census figures. A contract may be entered into with the United States census bureau to conduct a special census if the latest United States decennial census figures are not adequate. Each district shall be contiguous, compact, and as nearly square in shape as is practicable, depending on the geography of the county area involved, and shall be drawn without regard to partisan political advantage. Each city and township shall be apportioned so that it shall have the largest possible number of complete districts within its boundaries before any part of the city or township is joined to territory outside the boundaries of the city or township to form a district. Townships, villages, cities, and precincts shall be divided only if necessary to meet the population standard.

* * *

"(5) Any registered voter of the county, within 30 days after the filing of the plan for his or her county, may petition the court of appeals to review the plan to determine if the plan meets the requirements of the laws of this state. A finding of the court of appeals may be appealed to the supreme court of this state as provided by law." MCL 45.505; MSA 5.302(5).

Section 5(4) concerns the effective date of an apportionment plan;

Ct 1362; 12 L Ed 2d 506 (1964), requiring that state legislative districts be substantially equal in population, would be extended to subordinate units of state government. Indeed, it was that uncertainty regarding the reach of *Reynolds* which had divided this Court in *Brouwer.*

After Act 261 was enacted, this Court was called upon for an advisory opinion regarding the constitutionality of that act. A majority of the Justices first responded by signing an advisory opinion stating that article 7, § 7 "is valid and, therefore, PA 1966, No 261 is not". *Advisory Opinion re Constitutionality of PA 1966, No 261,* 379 Mich 55, 65; 149 NW2d 443 (1967).[10]

A year later, the United States Supreme Court decided *Avery v Midland County,* 390 US 474, 485-486; 88 S Ct 1114; 20 L Ed 2d 45 (1968), which held that the Equal Protection Clause of the United States Constitution requires "that units with general governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population".

A month later, the 1967 advisory opinion was "recalled" and six of the eight justices signed another advisory opinion stating that Act 261 "is valid, section 7 of article 7 notwithstanding. For

§ 5(6) permits any registered voter to submit a plan if the apportionment commission fails to submit a plan; § 5(7) states that a plan that becomes the official apportionment plan for the county remains in effect until the next United States official decennial census; and § 5(8) provides that the electors of each district shall elect one commissioner.

The statutory provisions above quoted reflect amendments made by 1980 PA 7.

[10] Decided April 10, 1967.

*Avery* has just lifted section 7 out of our Constitution, leaving the rest of article 7 intact with the legislature left free to implement it in the same manner as if no section 7 had ever appeared therein." *Advisory Opinion re Constitutionality of PA 1966, No 261,* 380 Mich 736, 740; 158 NW2d 497 (1968).[11]

## C

In 1968, the Court of Appeals, in its first county apportionment opinions, set the tone for subsequent adjudication by that Court. It emphasized achieving "districts of substantially equal population" without regard to the other statutory criteria.[12]

---

[11] The substitute advisory opinion, "upon reconsideration", was filed May 8, 1968.

The Court of Appeals had earlier reached the same conclusion in *In re Apportionment of the Ontonagon County Board of Supervisors—1967 (On Rehearing),* 11 Mich App 348; 157 NW2d 698 (1968).

[12] *Apportionment of Huron County Board of Supervisors,* 12 Mich App 326, 327; 163 NW2d 30 (1968); *Apportionment of Sanilac County Board of Supervisors,* 12 Mich App 330, 332; 162 NW2d 913 (1968). The divergence in the Huron plan of the largest district from the average was 8.97% and of the smallest district from the average was 8.54%. The divergence in the approved Sanilac plan of the largest district from the average was 2.8% and of the smallest district from the average was 3.62%.

In *In re Apportionment of Allegan County Board of Supervisors—1968,* 13 Mich App 692; 164 NW2d 665 (1968), the Court declared invalid a plan where the largest district was 34.3% above the average and the smallest 26.6% below the average. The Court also declared invalid the Muskegon plan in *In re Apportionment of Muskegon County Board of Supervisors—1968,* 13 Mich App 697; 164 NW2d 669 (1968); the opinion does not state the range of divergence.

In 1968, the Court considered two other plans in reported opinions. In *In re Apportionment of Ottawa County Board of Supervisors—1968,* 13 Mich App 701; 164 NW2d 667 (1968), the Court held invalid a plan where the largest district was 22.4% above the average and the smallest was 17.9% below the average. In *In re Apportionment of Washtenaw County Board of Supervisors—1968,* 13 Mich App 704; 164 NW2d 767 (1968), the Court approved a plan where the largest district was 6.37% above the average and the smallest was 6.74% below the average.

In 1970, the Court of Appeals again considered county apportionment. It rejected the argument that "variances in population are justified in order to obtain compact square-shaped districts, avoid gerrymandering, avoid the splitting of precincts, and to avoid the division of political subdivisions" in accordance with the criteria set forth in Act 261. *Apportionment of Muskegon County Board of Comm'rs—1970,* 23 Mich App 156, 159; 178 NW2d 154 (1970).[13]

In so concluding, the Court of Appeals relied on a 1968 decision of that Court which declared that the other criteria would "not justify districts of substantially unequal population". *In re Apportionment of Allegan County Board of Supervisors —1968,* 13 Mich App 692, 695; 164 NW2d 665 (1968). The Court said that this requirement had been "reinforced" by the United States Supreme Court in *Kirkpatrick v Preisler,* 394 US 526, 530; 89 S Ct 1225; 22 L Ed 2d 519 (1969), where the Court said that in drawing districts for the House of Representatives "the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality". Since *Avery* "imposes the 'one man-one vote' requirement on county government", the Court concluded that "the requirement stated in *Kirkpatrick v Preisler* relative to congressional apportionment is equally applicable in this case". "Laudable as may be the efforts to avoid gerrymandering and the fragmenting of political subdivisions, these too have been rejected by the Supreme Court if they

---

[13] The Court, again (see fn 12) addressing the apportionment of Muskegon County, disapproved a plan with a 24.2% range of divergence; the largest district was 10.8% underrepresented and the smallest was 13.4% overrepresented. *Apportionment of Muskegon County Board of Comm'rs—1970,* 23 Mich App 156, 158; 178 NW2d 154 (1970).

are used to avoid equal population." 23 Mich App 160.[14]

In 1972, the Court of Appeals again addressed the question of county apportionment. In *Apportionment of Ionia County Board of Comm'rs—1972,* 39 Mich App 676, 683; 198 NW2d 2 (1972),[15] the Court, in rejecting a plan on the ground that the population divergence was clearly unconstitutional, referred to *Avery* and *Kirkpatrick,* among other decisions concerning congressional districting. The Court did not, however, make any reference to a decision of the United States Supreme Court concerning county apportionment decided after both *Allegan County* and *Muskegon County.*

[14] The Court relied on Justice Brennan's statement for the Court in *Kirkpatrick v Preisler, supra,* which decision, again, concerned congressional districting.

The Court of Appeals did say, however, that some population variance would be permissible. It declined to adopt a fixed numerical or percentage population variance stating "that each plan must be considered on its own merits". It stated, however, for the guidance of those concerned "that any plan which contains a variance ratio in excess of 1:1.10 is of doubtful constitutionality." It added a caveat that "this is not to say that any plan which may have less than the above-stated ratio will be automatically approved. Upon review, the drafters of a plan are required to justify all population variances and demonstrate a good-faith effort to achieve population equality". *Apportionment of Muskegon County Board of Comm'rs—1970, supra,* 160-162.

[15] The divergence of the largest district from the average was 14.7% and of the smallest was 16.1%. The Court said that this was "patently unconstitutional by any standard". The Court discussed the number of political subdivisions left intact and split under the alternative plans and said that none demonstrate "that the drafters are in good faith trying to achieve population equality. On the contrary by publicly sanctifying the boundaries of the 19 political subdivisions and refusing to utilize census units and other techniques mandated by the statute, the drafters have demonstrated their lack of good faith." *Apportionment of Ionia County Board of Comm'rs—1972,* 39 Mich App 676, 682; 198 NW2d 2 (1972).

The Court early had said that "[t]he central aim of the legislation is to insure that the equal protection clause of the Fourteenth Amendment to the United States Constitution is applied to the election of county boards of commissioners". 39 Mich App 678.

In *Abate v Mundt,* 403 US 182; 91 S Ct 1904; 29 L Ed 2d 399 (1971), the United States Supreme Court had upheld a county apportionment plan with districts corresponding to the boundary lines of the county's five towns with the result that there was overrepresentation of 4.8% in one town and underrepresentation of 7.1% in another—a range of divergence of 11.9%.

The Court of Appeals also ignored *Abate* in subsequent 1972 opinions disapproving the original Oakland County and approving the Kent County plan.[16] The Court said, "[w]ith reference to the argument on the violation of political subdivisions, this Court has amassed in its *Ionia* opinion a long line of authority in an attempt to drive home the point to drafters that county commissioners' districts should not be designed to represent political subdivisions, but to represent people". *Apportionment of Oakland County Board of Comm'rs—1972,* 40 Mich App 493, 502-503, 504; 199 NW2d 234 (1972). Although the Oakland County Apportionment Commission had reduced the divergence to 10 to 12 persons per district, its action in adopting an "arbitrary" population figure as *de minimis* (100 persons per district) "negates the everpresent

---

[16] *Apportionment of Oakland County Board of Comm'rs—1972,* 40 Mich App 493; 199 NW2d 234 (1972); *Apportionment of Kent County Board of Comm'rs—1972,* 40 Mich App 508; 198 NW2d 915 (1972). Oakland ultimately adopted a zero divergence plan. The Kent plan was a zero divergence plan.

In *Apportionment of Van Buren County Board of Comm'rs—1972,* 39 Mich App 658; 198 NW2d 23 (1972) the Court disapproved a plan with a divergence of the largest district of 4.49% and of the smallest district of 3.47%. It also disapproved the Lapeer County plan in *Apportionment of Lapeer County Board of Comm'rs—1972,* 39 Mich App 666; 198 NW2d 33 (1972), because United States census figures were not used. It approved the Cass County plan in *Apportionment of Cass County Board of Comm'rs—1972,* 39 Mich App 671; 197 NW2d 892 (1972), where the divergence of the largest district was 0.48% and of the smallest was 0.66%.

possibility of achieving constitutional and mathe-
matical exactness. In so doing, it demonstrates the
lack of a good-faith effort."

It is again noteworthy that the "amassed au-
thority" in *Ionia* did not include any reference to
*Abate.* The failure of the Court of Appeals in the
1972 *Ionia, Muskegon* and *Oakland County* appor-
tionment decisions to advert to *Abate* suggests
that the analysis of the Court of Appeals was
incomplete. The still later 1973 decision of the
United States Supreme Court in *Mahan v Howell,*
410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973),
limiting *Kirkpatrick* to congressional districting,[17]
suggests that the Court of Appeals reliance, in
*Ionia, Muskegon* and *Oakland County,* on *Kirkpa-
trick* as reinforcing its earlier construction in *Alle-
gan County* of the phrase "as nearly of equal
population as is practicable" was incorrect.

In February of this year, the Court of Appeals
confronted *Mahan* (but again did not advert to
*Abate)* and declared that in the 1972 *Ionia County*
apportionment decision it "was not applying the
Fourteenth Amendment" but rather was "inter-
preting a state statute which attempted to codify
and enforce the constitutional principle of one
person, one vote on county boards of commission-
ers". It concluded that "the previous opinions of
this Court on the interpretation of the county
apportionment statute are still valid and binding
on the county apportionment commissions". *Ap-
portionment of Delta County Board of Comm'rs—*

[17] See *In re Apportionment of State Legislature—1982,* 413 Mich
120; 321 NW2d 573 (1982), discussing *Mahan v Howell,* where the
United States Supreme Court said that the constitutionality of a state
legislative redistricting plan was "not to be judged by the more
stringent" standard of *Kirkpatrick* and other cases concerning con-
gressional reapportionment.

*1982,* 113 Mich App 178, 181; 317 NW2d 568
(1982).[18]

## D

In *Abate, supra,* 186, in approving a county
apportionment plan with a range of divergence of
11.9% to preserve town boundary lines, the United
States Supreme Court said that "Rockland County
[New York] has long recognized the advantages of
having the same individuals occupy the governing
positions of both the county and its towns".

In Michigan, also, boards of supervisors (the
predecessor of the boards of commissioners) were
composed originally of the township supervisors.
Michigan has a history similar to Rockland
County in that "[w]hen population shifts required
that some towns receive a greater portion of seats
on the county legislature", the Legislature re-
sponded with a statute that reduced the "malap-
portionment".[19] The Michigan scheme, like the
Rockland County scheme, required the township
supervisor, and tended to encourage the mayor

[18] An examination of over 20 orders issued by the Court of Appeals
in 1982 apportionment cases indicates that the Court has insisted on
an apportionment commission adopting the plan with the least popu-
lation divergence from absolute equality, that no plan will be ap-
proved with a population variance ratio exceeding 1:1.10 and that
population equality must always take precedence over preservation of
the boundary lines of local political subdivisions.

The Court approved a Marquette plan having a maximum popula-
tion deviation of 112 persons, and Bay, St. Joseph, Mecosta and Barry
plans with corresponding figures of 65, 54, 53 and 46. Seven of the
other plans approved were 21 or less, and three of these were zero
deviation plans.

[19] It could not be said, as the United States Supreme Court said of
Rockland County, that the Michigan statute "substantially remedie[d]
the malapportionment". See *Brouwer v Kent County Clerk,* 377 Mich
616, 627 ff; 141 NW2d 98 (1966).

and other officials of larger cities, "to serve on the county board".[20]

*Abate* was written two years before *Mahan v Howell.* In *Mahan,* where election district lines had been drawn along county and city boundary lines,[21] the United States Supreme Court ruled that in state legislative apportionment, the apportioning body may, within limits, depart from the goal of population equality to achieve other rational, legitimate state goals such as preserving the integrity of political subdivisions of the state.[22]

## II

Both the Ingham and Wayne County Apportionment Commissions sought to achieve zero or substantially zero population deviation plans.

The Court of Appeals nevertheless ruled that the plan adopted by the Wayne County Apportionment Commission was void as violative of Act 261. It said that a lack of good-faith effort to achieve

---

[20] See fn 32, *infra,* and accompanying text.

[21] *Mahan v Howell, supra,* 319.

[22] There is no reason to suppose that *Mahan* establishes a rule restricted to legislative apportionment. We are persuaded that the same rational, legitimate state goals will justify departure from exact population equality in county apportionment.

In *Abate,* the Court had observed that "local legislative bodies frequently have fewer representatives than do their state and national counterparts". That, together with the relatively small population of their districts in comparison with congressional and state legislative districts, lends "support to the argument that slightly *greater* percentage deviations may be tolerable for local government apportionment schemes". 403 US 185. (Emphasis supplied.)

In *Gaffney v Cummings,* 412 US 735; 93 S Ct 2321; 37 L Ed 2d 298 (1973), the United States Supreme Court held that the divergences from absolute equality in the challenged legislative apportionment plan were *de minimis* and did not require any justification at all. One district was 3.93% underrepresented and another was 3.9% overrepresented for a total range of divergence of 7.83%.

districts of equal population was shown by evidence that "[m]athematical exactness was never the primary goal of the commission", the commission had "placed the inviolability of political subdivision and out-county election precincts[23] before mathematical exactness" and had shown "[a] reluctance to split census tracts by removing blocks to another district to achieve mathematical exactness". The cause was remanded to the apportionment commission with instructions that it adopt a new plan in accordance with provisions of Act 261.

In Ingham County, the Court of Appeals held that the plan adopted by Ingham's apportionment commission was void because it too had failed to meet the requirements of Act 261. All the Ingham plans had achieved zero deviation. The Court said that "once mathematical exactness in population is achieved" the subsidiary criteria of Act 261 must be observed and that the plan adopted by the commission was invalid because the apportionment commission had selected a plan which "mathematically violated the subsidiary guidelines" more than other plans that had been submitted.

This Court granted leave to appeal and ordered immediate briefing and argument and, after oral argument, additional briefing on whether the apportionment of Wayne County, which becomes a charter county on January 1, 1983, was governed by § 2 or § 7 of article 7 of the constitution and by Act 293 or Act 261.

## A

The petitioners in Wayne County are citizens of

---

[23] There was no issue regarding the preservation of Detroit precincts because it appeared that they were being redrawn without regard to county apportionment.

Dearborn, Dearborn Heights, and Westland. They contend that the so-called staff plan is preferable to the Holley plan, which was the plan adopted by the Wayne apportionment commission. The range of divergence under the staff plan was 0.48% and under the Holley plan 0.3%.

Under both plans six districts are made up entirely of Detroit and two districts are overwhelmingly Detroit districts.[24]

Under the staff plan:

(a) 72,597 of Dearborn (90,660) is combined with Allen Park, Melvindale, and 35,931 of Detroit to form a district; the remaining 17,063 of Dearborn is combined with Dearborn Heights (67,706), Garden City, and Inkster to form a district.

(b) Westland is combined with Wayne and 49,742 of Livonia (approximately one-half of Livonia's 104,814) to form a district; the remaining 55,072 of Livonia is combined with Redford Township and 42,223 of Detroit to form a district.

Under the Holley plan:

(a) 23,480 of Dearborn Heights (67,706) is combined with Redford Township and 74,010 of Detroit to form a district; 20,684 of Dearborn Heights, 64,447 of Westland, Garden City, and Inkster are combined to form a district; the remaining 23,542

---

[24] The staff plan includes the Grosse Pointes in a predominantly Detroit district and Harper Woods in another predominantly Detroit district. The Holley plan includes both the Pointes and the Woods in a single predominantly Detroit district. Under both plans Hamtramck and Highland Park are in a single predominantly Detroit district.

of Dearborn Heights, 54,603 of Dearborn, and Taylor are combined to form a district.

(b) 2,287 of Westland (84,603) is combined with Livonia, Northville City and Township, and Plymouth City and Township to form a district; 17,869 of Westland is combined with Sumpter, Huron and Van Buren Townships, Belleville, and Romulus to form a district and (repeating) the remaining 64,447 of Westland is combined with 20,684 of Dearborn Heights, Garden City, and Inkster to form a district.

Under the staff plan, more Detroiters vote in all-Detroit districts. Livonia alone among the communities that would, if kept intact, dominate a district is split under the staff plan.

Under the Holley plan, approximately 1/3 of Dearborn Heights (67,706) is in each of three districts; Dearborn (90,660) is split approximately 2/3 in one district and 1/3 in another district; and Westland is split approximately 3% in one district, 20% in another, and the balance in a third.[25]

## B

The petitioner in Ingham County is a proponent of the plan proposed by the Republican commissioners. The Ingham County Apportionment Com-

---

[25] Both plans split Southgate. Under the Holley plan, 1,004 of Southgate is in one district and 31,054 in another. Under the staff plan, 30,437 of Southgate is in one district and 1,621 is in another.

The staff plan combines 4,604 persons of River Rouge with part of Detroit to form a district. The remainder of River Rouge, 8,308, is combined with Ecorse, Lincoln Park, Riverview, Wyandotte, Grosse Ile Township, and 30,437 of Southgate to form a district. The Holley plan includes all of River Rouge (12,912) in a district that does not include any of Detroit.

mission adopted one of the three plans proffered by Democratic commissioners who made up a 3 to 2 majority of the commission.

The three Democratic and one Republican plan were, together with other plans that had been considered, all zero population deviation plans.

It is contended that the Republican plan is superior because the plan which was adopted (i) combines seven townships with cities in addition to the nine townships that are so combined under both plans, and (ii) divides, in addition to the two townships and two cities divided under both plans, one additional township and one additional city.

## III

While article 7, § 7, of the Michigan Constitution, insofar as it allots to each township one and only one member of the board of commissioners without regard to population, is violative of the Equal Protection Clause of the Fourteenth Amendment, the concept there set forth that the board shall be composed of representatives of townships and cities is not per se violative of the Fourteenth Amendment[26] and is a Michigan constitutional goal valid under the United States Constitution.[27]

## A

The declaration in the lead opinion in *Brouwer* that article 7, § 7 is violative of the Equal Protection Clause of the Fourteenth Amendment is not

_____
[26] See Part B, *infra.*

[27] See *Abate v Mundt, supra; Mahan v Howell, supra; Reynolds v Sims, supra,* 578 *(semble).*

precedentially binding because *Brouwer* was not a majority decision of this Court.[28]

 The 1968 advisory opinion is not precedentially binding because advisory opinions are not precedent.[29]

## B

It appears that the constitution embodies a "scheme of township and city representation in county boards of supervisors". *Brouwer v Kent County Clerk, supra,* 377 Mich 655. There were two parts to that scheme: (i) that the districts represented would be townships and cities, and (ii) that the persons who would constitute the board of supervisors would ordinarily be those who had been elected as supervisors of townships and as officials of city government or who would be designated or appointed by those who had been elected.

The concept that the board of commissioners should consist of representatives of townships and cities goes back at least to the Constitution of 1850. It provided that "[a] board of supervisors, consisting of one from each organized township, shall be established in each county". Const 1850, art 10, § 6. In apparent recognition of the growth of cities, the 1908 Constitution, retaining the language just quoted, added that "[c]ities shall have

[28] See *In re Curzenski Estate,* 384 Mich 334, 336; 183 NW2d 220 (1971); *Breckon v Franklin Fuel Co,* 383 Mich 251, 278; 174 NW2d 836 (1970); *Groening v McCambridge,* 282 Mich 135, 140; 275 NW 795 (1937); *Negri v Slotkin,* 397 Mich 105, 109; 244 NW2d 98 (1976); see generally 20 Am Jur 2d, Courts, § 189, p 524.

[29] See statements of the Justices in *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441; 208 NW2d 469 (1973); *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465, 477; 242 NW2d 3 (1976); see generally 20 Am Jur 2d, Courts, § 189, p 524.

such representation" on the board of supervisors as may be provided by law. Const 1908, art 8, § 7. That provision was repeated in the 1963 Constitution.[30]

As originally constituted, all the members of the board of supervisors were *ex officio*—they were members of the board not because they had been elected by the people as members of the board but because they had been elected by the people as township supervisors.

The concept that the board should be composed of the heads of the constituent political subdivisions of the county was implemented in the "provision of law" adopted after 1908 regarding representation from cities; while it was left to the cities to decide in their charters whether city representatives on the board of supervisors would be appointed or elected, it seems to have been generally provided in the charters that the mayor or other elected officials or persons designated by the city commission or council, sometimes along with persons elected at large, would be the cities' representatives.[31]

Thus, as originally contemplated and constituted, not only does the constitution speak of representation from townships and cities, but the

[30] See fn 2.

[31] See 1948 CL 117.27; MSA 5.2106; 1909 PA 279 (home-rule cities act). This section (§ 27) was repealed by 1966 PA 261. See *Brouwer v Kent County Clerk,* 377 Mich 616, 623; 141 NW2d 98 (1966) for text of § 27 and for a description of the charter provisions of Kent County cities which reflect the character of the composition of its board of supervisors, which we understand was typical of boards of supervisors generally.

The representation of fourth-class cities was governed by 1948 CL 87.26; MSA 5.1683, which provided that each ward supervisor would sit on the county board of supervisors.

persons who became members of the board were
generally persons who could be expected to speak
for the concerns of the constituent political subdi-
visions. The apparent rationale for a county gov-
ernment composed largely of representatives of
the constituent political subdivisions, rather than
persons directly elected by the people, is the no-
tion that decisions regarding the expenditure of
county revenue have such a substantial effect on
the level of service and revenue needs of the
constituent political subdivisions that those most
likely to be aware of and charged with the respon-
sibility of meeting those needs should have a voice
in how county resources are allocated.

The statute has nevertheless provided, since
1909, that city charters could provide for the
election of a city's representatives to the board of
supervisors, and representatives were elected. That
legislation was in effect given constitutional ap-
proval when the 1908 constitutional provision was
carried forward into the 1963 Constitution, follow-
ing extensive debate and consideration of various
alternative methods for constituting the board of
supervisors.[32] It therefore does not appear that the
concept that the representatives on the board
would be the heads of the constituent political
subdivisions has the status of a constitutional
requirement. The Legislature was free (except as
to townships) to provide for direct election by the
people of the members of the board of supervisors,
now the board of commissioners, as it has done in
Acts 261 and 293.

The Legislature was not, however, free, under
the 1963 Constitution, to provide for the establish-

[32] 1 Official Record, Constitutional Convention 1961, pp 942-952.

ment of election districts having boundary lines that do not follow the boundary lines of townships and cities.

## C

The invalidity under the federal constitution of the provision for one representative on the board of supervisors from each township (article 7, § 7) poses the question whether the constitutional "scheme of township and city representation in county boards" is severable.

The invalidity here, in contrast with *In re Apportionment of State Legislature—1982,* 413 Mich 136; 321 NW2d 581 (1982), does not go "to the heart of the political process". The provision here involved does not concern legislative apportionment, but apportionment for the county board of commissioners. Our concern in the state legislative apportionment case that the Court not arrogate to itself "a decision which the people should make" requires in the instant case that the Court enforce the decision which the people have made. To hold that the Legislature is free to abandon the scheme of township and city representation in county boards would be to relieve the Legislature of a limitation on its power which has existed since 1850. In the state legislative apportionment case, the fundamental question presented was whether the power to apportion the Legislature, which had been increasingly withdrawn from the Legislature until it was totally withdrawn from the Legislature and vested in an apportionment commission, should, in light of the invalidity declared by this Court, be returned to the Legislature.

If the Court were to have held that the power

returned to the Legislature without any limitation on the manner in which it was exercised, it would have restored to the Legislature power which had been denied by the people and it would have done so without a vote of the people. Here we again consider a limitation on the power of the Legislature. To hold that the power to provide for the apportionment of the county boards of commissioners returns to the Legislature without the constitutional limitation on that power would be to do precisely what the Court refused to do in the legislative apportionment case. Thus, paradoxically, a decision that the scheme of township and city representation in county boards is severable enforces the same value which the Court perceived in the state legislative apportionment case (although the Court there held that the provisions there involved were not severable) of not enlarging the power of the Legislature without a vote of the people. It also re-enforces the same value that the Court perceived in insisting, although it had declared the legislative apportionment rules and the commission not severable, that the criteria which had evolved over 100 years of constitutional history be enforced until the people declare whether the power to apportion the Legislature should be returned to the Legislature without limitation or be allocated or restricted by those or other limitations.

In holding that the Legislature is limited by the constitutional scheme of township and city representation, we implement the precept that a written constitution is not only an allocation of governmental power but a limitation on its exercise, and, in this instance, a limitation on the power of the Legislature. It is not open to this Court to relieve the Legislature of limitations on its power

beyond what is required to implement limitations on state power set forth in the United States Constitution.

We therefore hold that the Legislature cannot provide for representation on the board of commissioners other than from townships and cities except to the extent required by the Equal Protection Clause of the Fourteenth Amendment as elucidated by the United States Supreme Court.

We have considered whether the Equal Protection Clause of the Michigan Constitution[33] embodies the concept of one person-one vote, modifying article 7, § 7. The one person-one vote concept is clearly inconsistent with the scheme embodied in article 7, § 7. The supervisor of each township, without regard to the population of the township, was to be a member of the board of supervisors. In that circumstance and also in light of the rejection by the framers of the 1963 Constitution of proposals for substituting alternative methods for the establishment of the board more consistent with the one person-one vote concept[34] it is clear that the framers of the constitution and the people, in approving it, did not contemplate that the one person-one vote concept would be implemented in the establishment of the board.

The meaning of the Equal Protection Clause of this state's constitution cannot properly be enlarged to incorporate a concept clearly at odds with other provisions of this state's constitution. The invalidity or partial invalidity of those other provisions under the federal constitution does not

---

[33] Article 1, § 2.
[34] See fn 32 *supra*.

change the original scope of this state's Equal Protection Clause.

## IV

Separate and apart from the requirements of article 7, § 7 of the Michigan Constitution, Act 261 requires (for counties other than charter counties) and Act 293 requires (for charter counties) that county commissioner district lines be drawn to preserve city and township lines.

The Fourteenth Amendment requires that this be done with the least cost to the federal principle of equality of population between election districts consistent with the maximum preservation of city and township lines and without exceeding the range of allowable divergence under the federal constitution which, until the United States Supreme Court declares otherwise, shall be deemed to be the range approved in *Abate* of 11.9% (94.05% to 105.95%).

### A

Both Acts 261 and 293 state essentially the same criteria for the drawing of election district lines for the board of commissioners.[35] See Part IA,

[35] We have considered whether the apportionment rules of Act 293 (charter counties) or Act 261 (counties generally) govern the apportionment of Wayne County, which has adopted a charter that does not become fully effective until January 1, 1983.

Act 261 provides that in a county as large as Wayne (population over 600,000) the number of commissioners shall be 25 to 35. The Wayne County charter provides for 15 commissioners and the apportionment plan submitted provides for 15 commissioner districts.

The only authority for a board comprised of 15 commissioners is Act 293, and that authority is set forth in the very subsection of Act 293 which provides apportionment rules. Having invoked that subsection to reduce the number of commissioners from 25 to 15, Wayne cannot be heard to assert that the remaining provisions of that

*supra,* for a summary description of the statutory language and footnotes 6, 8 and 9 for the text of the statutory provisions.

Both acts require single-member, contiguous districts as nearly of equal population as is practicable and as compact and as nearly square in shape as is practicable, depending on the geography.

Act 293 (charter counties) states that each city and township shall be apportioned so that it has "the largest possible number of complete districts within its boundaries" before any part of the city or township is joined with other territory, and that townships, villages, cities and precincts shall be divided only, if necessary, to meet the population standard.

Act 261 states a concept not expressed in Act 293: no township or part thereof shall be combined with any city or village unless combination is needed to meet the population standard. But Act 261 similarly states that townships, villages, cities and even precincts shall be divided only, if necessary, to meet the population standard.

Both acts provide that district lines shall not be

---

subsection were not also invoked and that it can, therefore, continue to apportion according to a statute that provides for a minimum of 25 commissioners.

Further, that subsection refers to and adopts by reference the provisions of Act 293 providing for a charter commission, which provisions were necessarily invoked in establishing the charter commission for Wayne County.

The Legislature clearly contemplated that Act 293 would be applicable, firstly to the extent of establishing a charter commission, and secondly to the extent of establishing commission districts, before the charter of a charter county would become fully effective.

Since the apportionment rules under both acts are essentially the same, it is not likely to make a significant difference whether the apportionment rules of one statute or another are held to be applicable.

drawn to effect partisan political advantage. Act 261 alone provides that residents of state institutions who cannot vote shall not be considered in drawing district lines.

### B

Act 261, in providing that "the county apportionment commission shall be governed by the following guidelines in the stated order of importance", states a concept not set forth in Act 293. The stated order is (a) equality of population as nearly as is practicable; (b) contiguity; (c) compact and as nearly square in shape as is practicable; (d, e, f) not joining townships with cities and not dividing townships, villages, cities or precincts unless necessary to meet the population standard; (g) not counting residents of state institutions who cannot vote; and (h) that the district lines not be drawn to effect partisan political advantage.

If the stated order requires exhaustive compliance with each criterion before turning to a succeeding criterion, then criteria (a) through (c) alone would be determinative and criteria (d) through (f) could not be given any effect.

There are an endless number of ways in which one could construct the district lines consistent with criterion (a), equality of population, and criterion (b), contiguity. Criterion (c) requires that all districts shall be as compact and as nearly square in shape as is practicable, depending on the geography of the county area involved. Read literally and given an absolute priority, that criterion would require that the district lines be drawn without regard to township, village, city or pre-

cinct lines. The apportionment of a county would be a mechanical task.

If there were, say, sixteen commissioners, all that would need to be done, or indeed could be done, to apportion the county would be to find the population center of the county and to create four quadrants, and in each quadrant to find the population center and to create four more quadrants. Although each quadrant would not be of exactly the same size, each would have exactly the same number of people. All districts would be single-member and contiguous, and clearly the districts would not have been drawn to effect partisan political advantage. It is most unlikely, however, that any district line would coincide with any township, village, city or precinct line.

We reject such a rigid reading of "stated order" because so read:

(a) It would introduce a unique concept of apportionment; one which we are persuaded has not yet achieved political acceptance.

(b) It would impose a concept of apportionment for counties generally that is radically different than required for charter counties; we do not think that the Legislature intended such a rigid set of criteria for counties generally and no such constraint on charter counties.

(c) It would give no effect whatsoever to criteria (d) through (f) concerning the preservation of township, city, village and precinct lines, and thereby make meaningless those provisions. It is our duty to read the statute as a whole and to avoid a

construction which renders meaningless provisions that clearly were to have effect.

(d) The stated order of criteria would be violative of the Michigan Constitution which provides a "scheme of township and city representation in county boards" (see Part IIIB, *supra*). It is our duty to construe the statute to avoid a declaration of unconstitutionality.

C

Criteria (a) through (f) state apportionment goals. Criterion (g) concerns the counting of certain residents of state institutions. Criterion (h) states that the pursuit of partisan political advantage may not be a goal.

Criteria (d), (e), and (f) together with criterion (a) concern the population standard: all districts shall be single-member districts drawn to preserve township, village, city and precinct lines if this can be done within the population standard of composing districts "as nearly of equal population as is practicable".

Criteria (b) and (c) concern geography and serve to avoid gerrymandering. The districts are to be contiguous and to be as compact and as of nearly square shape as is practicable depending on the geography of the area involved.

In stating that the districts shall be compact and square as practicable, the Legislature stated a goal which is to take precedence over preserving the boundary lines of local governmental units to the extent that there are alternative plans by which those boundary lines could be preserved. Where

there is a choice between alternative plans both of which preserve such boundary lines, the plan which is more compact and square in shape is to be selected because compactness and squareness has a higher stated order of importance.

Compactness and squareness (criterion [c]) is not an end in itself but rather a means of avoiding gerrymandering. It was not intended that criterion (c) be implemented to the extent of entirely subordinating boundary lines criteria (d), (e) and (f).

## D

The meaning of the phrase "as nearly of equal population as is practicable" is rooted in the history of the legislation.

The bill which became Act 261 was introduced on April 14, 1965, the year after *Reynolds v Sims* was decided. The litigation which culminated in this Court's decision in *Brouwer v Kent County Clerk, supra,* had already been commenced shortly after *Reynolds* was decided. *Brouwer* was argued in this Court on November 3, 1965, and decided April 5 and 6, 1966. Act 261 was approved July 12, 1966 and Act 293 July 14, 1966.

It is clear from the history of Act 261 and of the apportionment provisions of Act 293 that they were designed to remedy the defect in the apportionment procedures for the county board perceived by the circuit judge in *Brouwer,* who was affirmed by an evenly divided Supreme Court in that case. The defect there perceived was the failure to observe the requirements of *Reynolds v Sims.*

When Acts 261 and 293 took form it had not been definitively decided by the United States Supreme Court whether *Reynolds v Sims* would be applied to county board apportionment nor was it clear to what extent the Supreme Court would permit divergence from absolute equality to implement the statement in *Reynolds v Sims* that a state may "legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territories in designing a legislative apportionment scheme". *Reynolds v Sims, supra,* 377 US 578.

Confronted with a determination in *Brouwer* which called for a legislative response before the United States Supreme Court had clearly defined the reach of *Reynolds v Sims,* the Legislature chose to use the exact words of *Reynolds v Sims.* In *Reynolds v Sims,* the Court had said that "[b]y holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, *as nearly of equal population as is practicable.* We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."[36] (Emphasis supplied.)

---

[36] This language was taken from *Wesberry v Sanders,* 376 US 1, 7-8; 84 S Ct 526; 11 L Ed 2d 481 (1964) a congressional apportionment case where the Court said:

"We hold that, construed in its historical context, the command of Art I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."

The United States Supreme Court gave meaning to its statement that mathematical exactness or precision is hardly a workable constitutional requirement in holding, in *Abate* and *Mahan,* that a divergence from absolute equality is permissible to achieve the state goals of drawing election district lines to coincide with the boundary lines of local political subdivisions.

With that history in mind, we conclude that the phrase "as nearly of equal population as is practicable" means in essence what the United States Supreme Court says it means. The Legislature recognizing that we were then, even today, in the foothills of the judicial development of what is meant by "as nearly of equal population as is practicable" left it, as it so often leaves other concepts, to the judiciary to develop.[37]

We thus conclude that Acts 261 and 293 require that commissioner district lines be drawn to preserve township, village, city and precinct lines to the extent this can be done without exceeding the range of allowable divergence under the federal constitution (11.9% [94.05% to 105.95%] until the United States Supreme Court declares otherwise) at the least cost to the federal principle of equal population between election districts consistent

[37] The Legislature has not thereby delegated its law-making power to the courts. It has rather, in recognition that the United States Supreme Court has the authority to articulate, in the construction of the United States Constitution, a limitation on the state's law-making power, avoided stating legislatively a standard more restrictive than the United States Supreme Court would require, and has simply left to the courts the development of the exact perimeters of this judicial limitation on state power. The Legislature did not delegate to the courts the power to exercise legislative discretion, but rather in an area where legislative discretion had been judicially limited avoided enacting a limitation beyond what is required to comply with federal constitutional requirements.

with the maximum preservation of such lines. Between two or more alternative plans, which comply with that standard, compactness and squareness in shape to the extent practicable shall govern.

V

It has been argued that county apportionment commissions have discretion in drawing the boundaries of county districts and that as long as they act in good faith their determinations should be sustained. One can accept that proposition without agreeing that it is dispositive in a particular case. Manifestly there will be areas for the exercise of judgment. A reasonable choice in the reasoned exercise of judgment should ordinarily be sustained.

A declaration by this Court that a county apportionment commission may exercise judgment and that the burden is upon objectors to show an absence of good faith would provide no guidance to the commission.

The members of the commission need to know whether there is a permissible range of divergence and, if so, its extent. May or must it go to 0.48% and choose the staff plan? May or must it go to 11.9% if necessary to preserve the boundaries of local political subdivisions?

Unless this Court states the range of divergence, neither the members of the commission nor objectors will know what is the duty of the commission or what showing must be made to establish an abuse of discretion or bad faith. Nor will they know, unless this Court construes the statutes and

states its views regarding the continuing viability of article 7, § 7 of the constitution, what is required by the statutes and the Michigan Constitution.

The Court has an obligation to state what are the governing criteria under the federal and state constitutions and applicable statutes so that the commissions will know what standards are to guide their deliberations and objectors will know what showing they must make in order to prevail on appeal.

To fail to provide such guidance is to deny meaningful judicial review. The statute contemplates judicial review of a plan approved by the commission "to determine if the plan meets the requirements of the laws of this state".[38] Judicial review is thwarted if neither the apportionment commission nor objectors know what the standards are and the extent of their burden, for without such foreknowledge the appellate court can always dismiss on the ground that the petitioner has failed to meet an undefined burden of showing a breach of an undefined standard.

Before *Baker v Carr,* 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962), courts avoided any responsibility in the apportionment process by declaring the matter to be a political question. To deny effective appellate review, by imposing on a petitioner an insurmountable burden—despite the articulation

---

[38] "Any registered voter of the county within 30 days after the filing of the plan for his county may petition the court of appeals to review such plan to determine if the plan meets the requirements of the laws of this state. Any findings of the court of appeals may be appealed to the supreme court of the state as provided by law." MCL 46.406; MSA 5.359(6).

MCL 45.505; MSA 5.302(5); see fn 9 for text.

of detailed apportionment criteria in the statutes and the establishment of a statutory and constitutional right of judicial review—is to indulge a judicial preference for noninvolvement.

Now that *Baker v Carr* is the law of the land and apportionment has become a justiciable question, this Court cannot escape its responsibility. Neither this Court nor the Court of Appeals will be seen to have acted apolitically if this Court fails to articulate in advance objective criteria, if it permits or makes subjective, ad hoc judgments from time to time depending upon the circumstances of the case, which almost inevitably will have a political taint.

This Court can maintain its neutrality only by speaking beforehand, before it knows and others may think that it knows the political consequences of its rulings. The Court owes it not only to the electorate but to the institution to protect itself against charges that when it does act it has done so in response to political pressure. It can best protect itself against such charges by stating in advance the criteria which should govern an apportionment commission before it or others can attribute the political consequences to the Court's decision.

The Court of Appeals is affirmed and the causes are remanded to the respective apportionment commissions.

COLEMAN, C.J., and KAVANAGH, LEVIN, and FITZGERALD concurred.

BLAIR MOODY, JR., J. *(dissenting in part)*. In these cases we are asked to decide whether the Court of Appeals erred in ordering the Wayne

County Apportionment Commission (hereinafter the WCAC) and the Ingham County Apportionment Commission (hereinafter the ICAC) to draft and submit to that Court new plans for reapportionment of the commissioner districts of those counties. The Court of Appeals determined that the plans adopted by those commissions did not meet "the requirements of the laws of this state" pursuant to MCL 46.406; MSA 5.359(6). We conclude that the Court of Appeals did err in the case of the WCAC, but we are not persuaded that error has been demonstrated in the resolution of the ICAC case. Accordingly, we would reverse the judgment of the Court of Appeals in *Apportionment of Wayne County Board of Comm'rs—1982.* Because we disagree with part of the order in *Apportionment of Ingham County Board of Comm'rs—1982,* the judgment of the Court of Appeals should be affirmed in part and reversed in part.

I

We dissent from the reasoning employed in the opinion of our colleagues. The Legislature is not bound by Const 1963, art 7, § 7.[1] That provision of the constitution has been declared unconstitutional. Nor can the Legislature be bound by a "concept" that is judicially engrafted upon a defunct provision.

Today the Court steps well beyond attempting to sever some language from a dead constitutional provision or reviving a portion of a phrase or a

[1] Const 1963, art 7, § 7:
"A board of supervisors shall be established in each organized county consisting of one member from each organized township and such representation from cities as provided by law."

clause. Here the Court creates and embellishes a judicial concept, knights it with a constitutional badge of honor, and constrains the Legislature to follow the concept by redrafting 1966 PA 261 and 293. It is a stark usurpation of legislative discretion without constitutional foundation to direct that the goal of preserving boundary lines of local governmental units must take precedence over the valid legislatively determined purpose of devising districts as "nearly of equal population as is practicable".

### A

We agree with the opinion of our colleagues that the language of art 7, § 7 of the Michigan Constitution which requires in organized counties a board of supervisors (commissioners) consisting of one and only one member from each organized township violates the Equal Protection Clause of the Fourteenth Amendment.[2] The apportionment of one and only one representative to a township without regard to population clearly runs afoul of the precepts of *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), and *Avery v Midland County,* 390 US 474; 88 S Ct 1114; 20 L Ed 2d 45 (1968).

It is clear that the drafters of our constitution rejected a more egalitarian method of selecting county officials.[3] The method finally adopted which provided for township, not people, representation cannot stand. Unlike our colleagues, we would end our Michigan constitutional analysis at this point.

From the premise that art 7, § 7 of the constitu-

[2] US Const, Am XIV.

[3] 1 Official Record, Constitutional Convention 1961, pp 942-952.

tion embodies "a scheme of township and city representation in county boards of supervisors", our colleagues take a large quantum leap in logic to conclude that the Legislature was not constitutionally free "to provide for the establishment of election districts having boundary lines that do not follow the boundary lines of townships and cities" except to the extent required by the Equal Protection Clause. It is readily observable that this section, which has been lifted out of our constitution, did not specify boundary line requirements for election districts.

The purported scheme or goals for representation for political units (township and city) cannot remain without the words of the constitutional provision. The "scheme" of representation referred to by our colleagues has no constitutional viability today. The goals and concepts of a constitutional provision do not have a separate life or meaning apart from the words of the provision. There can be no manifestation of any constitutional goal except through the language of a constitution. The concepts underlying the language of a provision are inseparable from the words which embody the concept. Once the language is removed, the underlying goals are no longer viable.

The alleged concept presented in the constitution is inseparable from the invalid allotment of one supervisor for each township. "The invalidity here declared goes to the heart of the political process in a constitutional democracy." *In re Apportionment of State Legislature—1982,* 413 Mich 96; 321 NW2d 565 (1982). The representation and governance of organized counties is severely altered once the absolute requirement of one supervisor from each township is eliminated. This is no

longer the type of board of supervisors for which the people voted when they adopted the Constitution of 1963.

The federal Equal Protection Clause requires that the art 7, § 7 scheme of township representation be voided. Accordingly, this Court must invalidate the concept of township representation including the goals which are inseparable from the words of the provision. When faced with the question of the constitutionality of Act 261 in light of art 7, § 7 this Court stated:

"PA 1966, No 261 is valid, section 7 of article 7 notwithstanding. For *Avery* has just lifted section 7 out of our Constitution, leaving the rest of article 7 intact with the legislature free to implement it in the same manner as if no section 7 had ever appeared therein." *Advisory Opinion re Constitutionality of PA 1966, No 261*, 380 Mich 736, 740; 158 NW2d 497 (1968).

See *Brouwer v Kent County Clerk*, 377 Mich 616; 141 NW2d 98 (1966) (equally divided Court affirmed circuit court decision voiding art 7, § 7), and *In re Apportionment of Ontonagon County Board of Supervisors—1967 (On Rehearing)*, 11 Mich App 348; 157 NW2d 698 (1968) (declaring art 7, § 7 unconstitutional). This did not, however, leave a vacuum regarding the apportionment of county boards.

B

Our constitution grants the Legislature extensive powers, limited only by specific provisions of the federal and state constitutions. See *Washington-Detroit Theatre Co v Moore*, 249 Mich 673, 680; 229 NW 618 (1930), *Hudson Motor Car Co v Detroit*, 282 Mich 69, 79; 275 NW 770 (1937). Thus

the Legislature is the appropriate body to determine the scheme of county governance.

The Legislature, in 1966, understanding the constitutional underpinnings of equality of representation, provided for apportionment of counties generally and also for charter counties. 1966 PA 261, 1966 PA 293.[4] The action of the Legislature filled

---

[4] 1966 PA 261, § 4 as amended:

"In apportioning the county into commissioner districts, the county apportionment commission shall be governed by the following guidelines in the stated order of importance:

"(a) All districts shall be single-member districts and as nearly of equal population as is practicable. The latest official published figures of the United States official census shall be used in this determination, except that in cases requiring division of official census units to meet the population standard, an actual population count may be used to make such division. Other governmental census figures of total population may be used if taken subsequent to the last decennial United States census and the United States census figures are not adequate for the purposes of this act. The secretary of state shall furnish the latest official published figures to the county apportionment commissions forthwith upon this act taking effect, and within 15 days after publication of subsequent United States official census figures.

"A contract may be entered into with the United States census bureau to make any special census if the latest United States decennial census figures are not adequate.

"(b) All districts shall be contiguous.

"(c) All districts shall be as compact and of as nearly square shape as is practicable, depending on the geography of the county area involved.

"(d) No township or part thereof shall be combined with any city or part thereof for a single district, unless such combination is needed to meet the population standard.

"(e) Townships, villages and cities shall be divided only if necessary to meet the population standard.

"(f) Precincts shall be divided only if necessary to meet the population standard.

"(g) Residents of state institutions who cannot by law register in the county as electors shall be excluded from any consideration of representation.

"(h) Districts shall not be drawn to effect partisan political advantage." MCL 46.404; MSA 5.359(4).

1966 PA 293, § 14, as amended:

"A county charter adopted under the provisions of this act shall provide for all of the following:

"(b) * * * The charter shall also provide for the partisan election of members of the legislative body from single member districts to be

the void left by the unconstitutionality of art 7,
§ 7. Furthermore, the constitution specifically

established by the county apportionment commission as created in
section 5 and pursuant to the standards and guidelines established in
section 5(2), (4), (5), (6), (7), and (8) for reapportionment based upon
the last official federal decennial census, effective at the first regular
general election of the members of the legislative body occurring not
less than 12 months after the completion and certification of the
federal census. Each city and township shall be apportioned so that it
has the largest possible number of complete districts within its
boundaries before any part of the city or township is joined to
territory outside the boundaries of the city or township to form a
district." MCL 45.514; MSA 5.302(14).

1966 PA 293, § 5, as amended:

"(2) The county apportionment commission, within 30 days after
the adoption of the resolution by the county board of commissioners,
shall establish charter commission districts equal to the number of
charter commissioners to be elected. All districts shall be single
member districts and as equal in population as practicable. The latest
official published figures of the United States official census shall be
used in this determination, except that in cases requiring a division of
official census units to meet the population standard, an actual
population count may be used to make the division. Other govern-
mental census figures of total population may be used if taken after
the last decennial United States census and the United States census
figures are not adequate for the purposes of this act. The secretary of
state shall furnish the latest official published figures to the county
apportionment commission * * * within 15 days after publication of
subsequent United States official census figures. A contract may be
entered into with the United States census bureau to conduct a
special census if the latest United States decennial census figures are
not adequate. Each district shall be contiguous, compact, and * * * as
nearly square in shape as is practicable, depending on the geography
of the county area involved, and shall be drawn without regard to
partisan political advantage. Each city and township shall be appor-
tioned so that it shall have the largest possible number of complete
districts within its boundaries before any part of the city or township
is joined to territory outside the boundaries of the city or township to
form a district. Townships, villages, cities, and precincts shall be
divided only if necessary to meet the population standard." MCL
45.505; MSA 5.302(5).

1980 PA 7 changed "as nearly of equal population as practicable"
to "as equal in population as practicable". We express no opinion on
the significance, if any, of this change.

After oral argument the parties in the WCAC case were asked to
brief whether the apportionment of Wayne County was governed by
§ 2 or § 7 of article 7 of the Constitution of 1963 and by Act 293 or
Act 261. The parties responded and agreed that Const 1963, art 7, § 7
and Act 261 applied. We would decline, given this situation, to apply
Act 293. *Cf.* fn 35 of the per curiam opinion.

grants the Legislature the authority to provide for the powers of counties. Const 1963, art 7, §§ 1, 2.[5]

In addition, the Constitution of 1963 made a significant break with the historical scheme of township and city representation as political units on county boards of commissioners. Art 7, § 2 permits the Legislature to draft procedures for county home rule. See 1966 PA 293. Thus, the constitution does not require township *qua* township representation on the county board in charter counties and specifically "permit[s] the organization of county government in form different from that set forth in this constitution". Const 1963, art 7, § 2.

Unlike the opinion of our colleagues, we conclude that returning the drafting of a procedure for county apportionment to the Legislature is consistent with our opinion *In re Apportionment of State Legislature—1982,* and that the question involved does go "to the heart of the political process" in county government. In the state legis-

---

[5] Const 1963, art 7, § 1:

"Each organized county shall be a body corporate with powers and immunities provided by law."

Const 1963, art 7, § 2:

"Any county may frame, adopt, amend or repeal a county charter in a manner and with powers and limitations to be provided by general law, which shall among other things provide for the election of a charter commission. The law may permit the organization of county government in form different from that set forth in this constitution and shall limit the rate of ad valorem property taxation for county purposes, and restrict the powers of charter counties to borrow money and contract debts. Each charter county is hereby granted power to levy other taxes for county purposes subject to limitations and prohibitions set forth in this constitution or law. Subject to law, a county charter may authorize the county through its regularly constituted authority to adopt resolutions and ordinances relating to its concerns.

"The board of supervisors by a majority vote of its members may, and upon petition of five percent of the electors shall, place upon the ballot the question of electing a commission to frame a charter.

"No county charter shall be adopted, amended or repealed until approved by a majority of electors voting on the question."

lative apportionment case, this Court invalidated the constitutional apportionment requirements and the process of apportionment by a commission. We concluded that the constitutional apportionment standards were not severable from the invalidly weighted land area-population formulae. Furthermore, we determined that an apportionment commission without standards could not survive.

Therefore, this Court, in order to preserve orderly elections and to permit the necessary reapportionment, ordered the preparation of a legislative apportionment plan consistent with guidelines which found their genesis in Michigan's constitutional history. By directing a plan to be developed that would meet strict and narrow guidelines, this Court attempted to develop standards for the drafting of a neutral and nonpartisan plan. These guidelines were only that, and not constitutional requirements. The Court-ordered plan is to continue only until the people or the other two branches of government in this state act.

Finally, in the legislative apportionment case, the Court directed that the Court's plan could be superseded at any time by a contrary plan developed by the Legislature and approved by the Governor. Such a plan need not follow the guidelines of the Court-ordered plan. Having declared unconstitutional the apportionment rules of art 4, §§ 2-6,[6] this Court is without the legitimate power to order the other two branches of government to follow non-constitutionally required guidelines. Therefore, in the legislative apportionment case,

[6] Apparently all that remains after *In re Apportionment of State Legislature—1982, supra,* in art 4, §§ 2-6 are the non-apportionment requirements of single-member districts, duties of election for senators, numbers of representatives and senators, and perhaps § 4 relating to annexations and mergers between apportionments and § 5 which concerns contiguity of islands.

as in the case of apportionment of counties, the Legislature is limited only by the federal constitution and any *requirements* of the Michigan Constitution which apply, but not the invalid apportionment rules. There is no scheme of township and city representation with a viable constitutional base which demands virtually unyielding adherence to boundary lines. Thus, the Legislature is free to design any system of apportionment as long as it does not run afoul of the Equal Protection Clause of the federal constitution.[7]

## C

The opinion of our colleagues concludes that the statutory apportionment guidelines for county commissioner districts require that boundary lines be drawn to preserve city and township lines. Apparently their opinion would place precinct boundaries above a goal of more equality than 11.9%.[8] In *Abate v Mundt,* 403 US 182; 91 S Ct 1904; 29 L Ed 2d 399 (1971), the United States Supreme Court found that a county reapportionment plan which provided for a 11.9% population deviation between districts did not contravene the Equal Protection Clause of the United States Constitution. Compare *Mahan v Howell,* 410 US 315; 93 S Ct 979; 35 L Ed 2d 320 (1973); *Chapman v Meier,* 420 US 1; 95 S Ct 751; 42 L Ed 2d 766 (1975). We believe it is erroneous to conclude that (1) the "stated order" of Act 261 must be read so as not to violate the "scheme of township and city representation in county boards" of the Michigan

---

[7] It is certainly not clear that the Equal Protection Clauses of the Michigan Constitution have no relevance in the instant case. Compare *Brouwer v Kent,* 377 Mich 660 (Justice SOURIS, for affirmance), discussing Const 1963, art 1, §§ 1 and 2 with the discussion in the last two paragraphs of Part IIIC of the opinion of our colleagues. This issue need not be considered.

[8] But see fn 14.

Constitution; (2) the allowable divergence of 11.9% is the proper standard; and (3) a standard of allowable divergence must be set at this time.

We address these issues *seriatim.* Act 261, as amended, requires the county apportionment commission to be governed by apportionment guidelines in the stated order of importance. Eight guidelines are set forth, the primary guideline being population equality. It is apparent that the legislative plan of apportionment appropriately makes equality of population the controlling consideration in the apportionment of commissioner districts. See *Reynolds v Sims,* 377 US 567. The words and structure of the statute place population equality first, but do require that all of the guidelines are to be considered and followed without excluding any, but observing the stated order. Thus, the duty of the apportionment commission is to consider and apply the guidelines as mandated by the statute.

By reviving the invalid constitutional requirements of adherence to township lines under the new guise of guidelines, the majority opinion rewrites the statute, exalting boundary lines over an apportionment commission's attempt to reach the statutory standard of equality of population.

In practical terms the opinion of our colleagues concludes that the ICAC and WCAC provided for districts too nearly equal in population. That is an incorrect conclusion and is unsupported by law or logic. The majority opinion, after rearranging the stated order of criteria in Act 261 so that the boundaries of political subdivisions are given primacy, goes on to conclude that apportionment commissions are free to adopt plans which deviate from population equality among districts so long as the deviation does not exceed 11.9% per *Abate,*

*supra.* In doing so the majority has transformed an ad hoc decision of the United States Supreme Court which turned upon whether the deviation in a county apportionment plan was unconstitutional into a standard to be followed. In other words, the effect of the majority decision is to tell apportionment commissions that they shall deviate from population equality to preserve the inviolability of the boundaries of political subdivisions. Thus is the essentially negative finding of *Abate* (the plan was not unconstitutional) by metamorphosis transformed into an affirmative command by this Court.

Obedience to an 11.9% deviation

"disregards the critical fact that adherence to a percentage deviation that is at the outside limits of constitutionality cannot be squared with the overriding constitutional objective of 'substantial equality of population' among districts. The Pennsylvania Constitution [similar to Act 261] plainly states that districts shall be 'as nearly equal in population as practicable.' [Pa Const, art 2, § 16.] Thus, the clear constitutional directive is that reapportionment shall strive to create districts as equal, not as unequal, as possible." *In re Reapportionment Plan for Pennsylvania General Assembly,* 497 Pa 525, 536; 442 A2d 661, 667 (1981).

Thus, it should not be presumed that an apportioning body which complies with the overriding objective of population equality must have its plan reversed by a court. To allow this to happen would turn the constitutional requirement of equality on its head and exalt district representation over people representation.

Furthermore, the posture and language of the *Mahan* case and more appropriately the *Abate* case do not suggest that this Court should reverse the work of the county apportionment commissions. In *Abate* and *Mahan,* the Supreme Court

reviewed apportionment plans which had been developed and adopted by the appropriate apportioning bodies. The approval of each plan, based on a full record of justification for any deviation from mathematical equality, is far different from a court acting as a super-apportionment commission setting population standards at the outer limit of decided case law. In *Abate* and *Mahan,* the Supreme Court permitted and approved the apportionment plans drafted by the representatives of the people. Today, the Court apparently invalidates plans because the "good faith effort" to achieve population equality has been too goodfaith. *Cf. Lucas v Forty-Fourth General Assembly of Colorado,* 377 US 713, 735, fn 27; 84 S Ct 1459; 12 L Ed 2d 632 (1964).

Furthermore, the population deviation that has been approved in one state or county apportionment plan is no guaranty nor does it have much bearing on the question of the validity of a plan for a different locale. *Reynolds v Sims,* 377 US 578; *Mahan v Howell,* 410 US 328-329; *Swann v Adams,* 385 US 440, 445; 87 S Ct 569; 17 L Ed 2d 501 (1967).

Finally, like the United States Supreme Court, we believe the preferable course to follow in reviewing apportionment cases is on a case-by-case basis. See, *e.g., Chapman v Meier,* 420 US 22; *Swann v Adams,* 385 US 445. Each plan must be examined. The Supreme Court has not set a benchmark standard, neither should this Court.

We recognize that equality of population under the federal Equal Protection Clause and the statutory apportionment guidelines does not mean precise mathematical equality. Deviation from the perfect district is constitutionally and statutorily permissible. Each case and plan should be examined on its facts. The county apportionment com-

mission[9] is well able to determine the constitutional and statutory meaning of equal protection. This Court need not and should not set a standard now, particularly one which developed out of a particular fact situation with different justifications than the instant cases.

## II

## A

We now turn to analyze these cases in accordance with the statute. The WCAC convened on November 2, 1981. In an election held on November 3, 1981, the voters of Wayne County approved the Wayne County Charter. That charter, *inter alia,* reduced the number of commissioners of the county from 27 to 15. Most of the provisions of the charter are to be effective on January 1, 1983.[10] The charter further provided in § 8.120(a):

"The existing county apportionment commission shall provide the apportionment plan as provided by law for the initial election of county commissioners under this charter in the 1982 primary and general elections for the commission established under this charter."[11]

After receiving the 1980 United States official census figures, the WCAC proceeded to apportion the commissioner districts. For purposes of this appeal it may be assumed the apportionment was completed under MCL 46.404; MSA 5.359(4).[12]

At its meeting of December 8, 1981, the WCAC received a proposed reapportionment plan from its own staff. One of the commission members, Hubert

[9] MCL 45.505(1); MSA 5.302(5)(1), MCL 46.403(1); MSA 5.359(3)(1).
[10] Home Rule Charter for Wayne County, Article 8.119.
[11] See the discussion in fn 4.
[12] See fn 4 for the text of the statute.

Holley, also submitted a proposed apportionment plan for eastern Wayne County.

At the next meeting, held on December 14, 1981, Mr. Holley submitted a revised plan which encompassed the entire county. In addition, Mr. Holley submitted a written comparison of his plan with that of the staff plan.

At its meeting of January 6, 1982, the WCAC discussed the revised Holley plan and the staff plan which had been revised as of this same date. The members of the WCAC agreed that both plans were in "substantial compliance" with the apportionment guidelines. It was noted, however, that other plans might be submitted for review.

Two other proposed apportionment plans were submitted. In addition, Mr. Holley submitted a third revision of his proposed plan on January 12, 1982. The WCAC agreed, unanimously, to adopt and file Mr. Holley's third revised plan.

MCL 46.406; MSA 5.359(6) states:

"Any registered voter of the county within 30 days after the filing of the plan for his county may petition the court of appeals to review such plan to determine if the plan meets the requirements of the laws of this state. Any findings of the court of appeals may be appealed to the supreme court of the state as provided by law."

Two petitions were filed pursuant to this statutory provision. The petitioners, citizens of the cities of Dearborn, Dearborn Heights, and Westland, complained that the revised staff plan was preferable to the plan adopted by the WCAC. The petitioners from Dearborn Heights and Westland stated that their cities had been unnecessarily divided into three districts, that the shape of the commissioner districts was "violative of the guide-

lines as set forth in MCL 46.404", and that there had been "partisan political considerations" in adopting the plan. The petitioner from Dearborn argued that further study by the WCAC would produce a better plan. He objected to the division of Dearborn into two districts, to the shape of the districts, and to "partisan political considerations" in adopting the plan.

On February 16, 1982, the Court of Appeals issued the following order:

"In this cause petitions for review of the apportionment of the Wayne County Board of Commissioners having been filed by John B. O'Reilly, in Docket No. 62576, and Donald Bishop, et al., in Docket No. 62577, all registered voters of said county, pursuant to MCL 46.406; MSA 5.359(6), and due consideration thereof having been had by the Court;

"It is ordered that the Wayne County Apportionment Commission show cause on or before February 26, 1982, why its plan of apportionment should not be held invalid or unconstitutional under applicable statutes and constitutional provisions. The commission's answer shall include the following:

"1. Justification for all population variances from equality, no matter how small, in each district of the adopted plan.

"2. A complete set of census materials as provided by the apportionment commission by the Secretary of State.

"3. A complete set of the minutes of the meetings of the apportionment commission, together with a copy of the plan adopted, as well as copies of all plans submitted for consideration. These plans shall consist of visually drawn maps and verbal descriptions of commissioner districts by identified enumeration districts, with United States census figures for each ED and totals for each commissioner district. The apportionment commission shall state specific reasons for the commission's rejection of each plan submitted to them for their consideration.

"4. A written reply to any additional issues raised in the petitions for review."

The WCAC responded to this order. However, the Court of Appeals was unsatisfied by the response, and on March 31, 1982, it held:

"In this cause petitions to review the apportionment plan of the Wayne County Board of Commissioners having been filed, and a response having been filed by the Wayne County Apportionment Commission, and due consideration thereof having been had by this Court; therefore

"It is ordered that the plan adopted by the Wayne County Apportionment Commission is void because it does not meet the requirements of the laws of this state, and it is in violation of 1966 PA 261. A lack of good-faith effort to achieve districts of equal population is evidenced by at least the following in the record: (1) Mathematical exactness was never the primary goal of the commission as required by this Court. *Apportionment of Oakland County Board of Comm'rs—1972,* 40 Mich App 493 (1972); *Apportionment of Kent County Board of Comm'rs—1972,* 40 Mich App 508 (1972). (2) The commission placed the inviolability of political subdivisions and out-county election precincts before mathematical exactness. *Apportionment of Ionia County Board of Comm'rs—1972,* 39 Mich App 676 (1972); *Apportionment of Oakland County—1972, supra.* (3) A reluctance to split census tracts by removing blocks to another district to achieve mathematical exactness. Given the refinement of the census materials in Wayne County and this Court's opinions ten years ago in *Oakland* and *Kent* resulting in zero-deviance plans, the Court can accept no less from Wayne County.

"We remand the cause to the Wayne County Apportionment Commission with express instructions to modify the adopted plan or to adopt a new plan in accordance with this order and the provisions of 1966 PA 261 and, further, to submit the new plan to this Court for review within 12 days of the date of the certification of this order. *Apportionment of Delta County—1982,* File

No. 61566. Any plan before the apportionment commission shall first be completely verified as to boundaries and population by the Wayne County Apportionment Commission staff before a vote may be taken on the plan. Each plan submitted on remand must have an individual vote on it, with individual members explaining their vote on the record. Such record and copies of all plans shall be submitted to this Court together with a justification for any variance from zero deviance in each district of the adopted plan with reference to census material. The Court points out the answer of the commission to the show-cause order of this Court was unresponsive in this respect.

"The issues raised by the petitioners are considered without merit in that there was (1) no showing that the splitting of political subdivisions was unnecessary in order to achieve equality of population. (2) Even if petitioners had achieved the admissions they sought by their motion to depose, it would not be sufficient to meet the test of actual evidence of an intentional and systematic disenfranchisement as established in *Kent* and *Oakland, supra.* Accordingly, petitioners' motion to compel deposition is denied."

The WCAC applied for leave to appeal. The application was granted, and this Court stayed further proceedings in this matter.

## B

The ICAC held its first meeting on November 3, 1981. In all, 13 plans were submitted to the commission for its review. Several of that number, however, were revisions of earlier submittals. All plans had a zero population deviation among the districts. However, the plans differed in many respects with regard to the degree to which they adhered to the rest of the guidelines set forth in MCL 46.404; MSA 5.359(4).

The first two plans which were submitted were

not moved for consideration. The next two plans were so moved, but the motions failed by a 3 to 2 vote. Thereafter several plans were submitted, but were not moved for consideration or failed to receive a sufficient number of votes to carry the motion. Finally, at its meeting of February 2, 1982, the commission had available for consideration four plans known as the Baker Plan #2, the Brewer Plan #1, the Brewer Plan #2, and the Houk Plan #3. The ICAC decided, by vote of 3 to 2, to adopt and file the Baker Plan #2.

On March 3, 1982, Jane Schoneman filed a petition for review of the plan in the Court of Appeals. The petitioner complained that the plan "violated" the guidelines contained in MCL 46.404(c), (d), (e) and (f); MSA 5.359(4)(c), (d), (e) and (f). Specifically it was charged that:

"In adopting the Baker Plan #2, the commission majority selected from the plans before it the plan which has (a) the most irregular lines and oddly-shaped districts; (b) the greatest number of districts combining cities with townships; (c) the greatest number of districts dividing townships and cities; and (d) divided the greatest number of precincts in the county."

The petitioner claimed that the plan which the ICAC had adopted compared unfavorably in these respects with the McKeague Plan #3, the Brewer Plan #2, and the Houk Plan #3. The petitioner asked the Court of Appeals to either order the ICAC to adopt a new plan or to approve "that plan which was submitted to the commission which best conforms to the requirements of the law".

On March 4, 1982, the Court of Appeals issued a show-cause order directed to the ICAC which was virtually identical to that previously issued to the

WCAC. The ICAC responded to the order. However, on April 5, 1982, the Court of Appeals issued the following order:

"In this cause a petition to review the apportionment of the Ingham County Board of Commissioners having been filed, and a response having been filed by the Ingham County Apportionment Commission, and due consideration thereof having been had by this Court; therefore

"It is ordered that the plan adopted by the Ingham County Apportionment Commission is void because it does not meet the requirements of the laws of this state, and it is in violation of 1966 PA 261, for failure to comply with the subsidiary guidelines of § 4. The record reveals that all plans filed before the commission achieved zero deviance. However, the commission selected the plan which mathematically violated the subsidiary guidelines (c), (d), (e) and (f) more than other plans before the commission. The Court has stated that the subsidiary guidelines of the statute must give deference to the primary guideline of districts of equal population. *Apportionment of Ionia County Board of Comm'rs—1972,* 39 Mich App 676 (1972). However, once mathematical exactness in population is achieved, this Court shall then apply those subsidiary guidelines in any review. *Apportionment of Allegan County Board of Supervisors—1968,* 13 Mich App 692 (1968); *Apportionment of Oakland County Board of Comm'rs—1972,* 40 Mich App 493 (1972).

"We remand the cause to the Ingham County Apportionment Commission with the express instructions to adopt a new plan in accordance with this order and the provisions of 1966 PA 261 and further, to submit the new plan to this Court for review within ten days of the date of the certification of this order. On remand the commission shall: (1) Meet daily and hold its first meeting within 48 hours of the date of the certification of this order. At this meeting the commission shall first re-determine the size of the board. In a situation where plans for any size board are all zero deviance, we decline to interfere with the commission's statutory

discretion as to size. Such discretion may only be questioned by the necessity to achieve districts of equal population. *Apportionment of Van Buren County Board of Comm'rs—1972,* 39 Mich App 658 (1972). To qualify board size discretion with the subsidiary guidelines would, in most cases, force the commission to the smallest board size and, thereby, destroy such discretion. However, within the context of zero deviance and a chosen board size, a commission must develop and choose such a plan which mathematically produces the least violations of the subsidiary guidelines. (2) At the first two meetings any commission member may submit a plan for the approved board size, provided it is a zero deviance plan. *Apportionment of Delta County—1982,* File No. 61566. (3) Each plan must be verified by the Tri-County Regional Planning Commission within 48 hours and amendments to the plans within 24 hours in the following form: (A) Verification of the population figures within each district and the legal description of such district; (B) Determine the compactness of each district by computing the land area (excluding land outside the county) outside the district which has been circumscribed by a circle. *In re Apportionment of State Legislature—1982,* No. 68777; (C) Total the townships or parts thereof attached to cities or parts thereof within each district, and the totals for the entire plan; (D) Specifically identify each township, village or city divided, and the total number of divisions for the individual political subdivision in the plan; (E) Total the number of precincts divided by the plan. (4) After initial verification, any plan submitted may be amended by the member submitting the plan within 24 hours. (5) The commission shall then vote upon each plan submitted with each member giving reasons for his vote. (6) The proceedings of the commission shall be recorded by means of a verbatim transcript prepared in copy form overnight. (7) The plan adopted, all other plans, the Tri-County Regional Planning Commission's verifications, the transcript, and a justification for the variance of each guideline in § 4(c) through (f), and a justification for not adopting any plan with fewer mathematical counts in each guideline shall be filed with the clerk of this Court. A map for each plan shall also be filed, but

it must be a legible census map and not a so-called '1978 Jurisdictional Map'. Petitioner may file objections within 24 hours."

The ICAC filed an application for leave to appeal with this Court. The application was granted, and we have stayed further proceedings in this matter.

## C

Pursuant to MCL 46.406; MSA 5.359(6), the Court of Appeals, upon the filing of a petition for review, must ascertain whether the apportionment plan adopted by the commission "meets the requirements of the laws of this state". Thus, it is clear that if the Court of Appeals determines that the plan fails to adhere to statutory mandates or constitutional requirements, it cannot approve the plan.

In the case of the WCAC's plan, the order of the Court of Appeals indicates only one area of deficiency—a failure to achieve absolute mathematical equality (zero deviation) among commissioner districts. The "ideal district" for Wayne County in terms of mathematical equality is 155,859.4. The plan which was eventually adopted by the WCAC had a variance range of 471. That is, the district which most exceeded the ideal size in terms of population had 183.6 more people than would be "ideal". The district which had the largest variance in terms of underpopulation measured against the ideal had 287.4 less people than would be "ideal". In terms of percentage of difference from zero deviance, the plan adopted by the WCAC had 0.3% deviation. On the other hand, the revised staff plan, lauded by the petitioners, had a variance range of 745 people with a 0.48% devia-

tion factor. The revised staff plan also had more splits (division of townships, cities, and villages) than did the plan adopted by the WCAC.

In spite of the extremely small percentage of deviation, the Court of Appeals rejected the plan. The reason for the rejection was that the Court of Appeals has interpreted MCL 46.404; MSA 5.359(4) to require mathematical equality or zero deviation as a *sine qua non* for approval. It is only after this requirement has been met that the Court of Appeals will examine the plan for compliance with the other guidelines set forth in this statute.

In the case of the 1982 WCAC plan, the Court of Appeals said:

"Given the refinement of the census materials in Wayne County and this Court's opinions ten years ago in *Oakland* and *Kent* resulting in zero deviance plans, the Court can accept no less from Wayne County."

The concept of absolute mathematical equality in election districts, so prominently noted in *Kirkpatrick,* has been revised by subsequent case law, most notably by *Abate v Mundt, supra,* by *Mahan v Howell, supra,* and by *Gaffney v Cummings,* 412 US 735; 93 S Ct 2321; 37 L Ed 2d 298 (1973).

In *Abate* the Court reviewed the apportionment plan of the Rockland County, New York, Board of Supervisors. There was a total deviation from population equality among the five districts of 11.9%. The Court rejected a claim that the plan violated equal protection standards. The Court observed that some deviations would be permitted provided they were based on rational state policy.

In *Mahan,* the United States Supreme Court

examined the validity of the Virginia State Legislature redistricting plan. The Court held that while absolute population equality was the sole criterion in congressional apportionment, greater flexibility would be permitted in state legislative apportionment and that a rational state policy could justify minor deviations from precise equality.

In *Gaffney* the Court held that some deviations in a state legislative plan were "so minimal" that no justification for the population variances was required. The deviation on the average was 1.9% and the maximum deviation was 7.83%.

Based upon these decisions, it is recognized that the federal constitution does not require absolute mathematical equality for county reapportionment. It is clear to us that the *ratio decidendi* for the Court of Appeals interpretation of MCL 46.404; MSA 5.359(4) as requiring zero population deviance is the *Kirkpatrick* case. We can discern no legislative intention to require absolute mathematical equality to the virtual exclusion of the other guidelines contained in the statute. It is true that in the hierarchy of the guidelines in the statute the consideration of having districts "as nearly of equal population as is practicable" is given primacy. However, to say that is not to say that the other criteria need only be consulted when and if a plan attains zero population deviance. The phrase "as nearly of equal population as is practicable" does not mean "mathematical equality". If the Legislature had intended to require mathematical equality, it could easily have done so. It did not, and we interpret the language of MCL 46.404; MSA 5.359(4) as not requiring mathematical equality in the apportioning of commissioner districts on the basis of population.

D

In rejecting the plan of the ICAC, the Court of Appeals made a finding that that plan, though a zero deviance plan, compared unfavorably with three other plans which were submitted to the Court of Appeals for purposes of comparison. The petitioners alleged that the plan adopted by the ICAC had districts which were not as compact and of nearly square shape as would be practicable, and combined more townships or parts thereof than was needed to meet the population standard (which was assumed to be zero deviation). In addition, the petitioners claimed that the plan adopted by the ICAC divided more townships, cities, and precincts than any of the other plans which had been before the ICAC.

The Court of Appeals in its order of April 5, 1982, in which it rejected the plan adopted and filed by the ICAC, made a finding that the ICAC's plan "mathematically violated the subsidiary guidelines (c), (d), (e) and (f) more than other plans before the commission". In addition, the Court ruled that "within the context of zero deviance and a chosen board size, a commission must develop and choose such a plan which mathematically produces the least violations of the subsidiary guidelines".

As to the shape of the districts in the ICAC plan, the petitioner alleges that although this is a "difficult" guideline to assess, nevertheless a visual comparison of the ICAC plan vis-à-vis the three other plans used for comparison reveals that the ICAC plan is "comprised of more irregular lines and oddly shaped districts". The petitioner also contends that an examination of the ICAC plan

and the three other plans reveals that the ICAC plan was the least "compact" as that term was defined in *In re Apportionment of State Legislature—1982.*[13]

With regard to the issue of combining townships with cities to form districts, the petitioner proffers two methods of counting: one would simply count the number of districts with such combinations, while the other would add the number of townships, cities or villages within the county and then count the number that were combined by each plan. (The ICAC argues that the latter method should be employed.) Under either method, argues the petitioner, the ICAC plan is the worst or equal to the worst as compared to the other three plans.

As to division of townships, villages, and cities the petitioner points out that under either of the two methods of counting alluded to above, the ICAC plan, compared to the other three, is not the best plan. Under the first method of counting, the ICAC plan was the worst plan. Under the second method of counting, the ICAC plan is the worst or equal to the worst when compared to the other three plans.

Finally, the petitioner has charged that the ICAC plan divides more precincts (85, as opposed to 49, 76, and 76) than the other three plans and that the ICAC has given no credible justification for this other than to charge that this criterion should be ignored because it exists simply for the convenience of clerks.

---

[13] In *In re Apportionment of State Legislature—1982,* 413 Mich 134; 321 NW2d 580 (1982), we stated:

"e) An election district, circumscribed by a circle, containing the least land area (excluding land outside of this state or under the Great Lakes) outside of the district, is the most compact."

The ICAC, the appellant here, responds to the arguments of the petitioner in two ways. First, the ICAC, as noted above, challenges the manner in which the petitioner has calculated the number of combinations and divisions. In addition, the ICAC claims that the method of calculation employed by the petitioner fails to take into account an annexation by the City of Williamston in 1980. As to "compactness", the ICAC contends that the Court of Appeals and the petitioner have improperly applied the definition of compactness set forth in our opinion in *In re Apportionment of State Legislature—1982* to a plan adopted before that decision was rendered. Finally, as to the splitting of precincts, the ICAC argues that precincts are, indeed, nothing more than artificial entities and that the fact that its plan splits more precincts than the others does not warrant a rejection of the plan.[14]

The ICAC's most emphasized point on appeal, however, is that the Court of Appeals erred in invalidating its plan on the theory that the ICAC should have adopted the plan which "mathematically produces the least violations of the subsidiary guidelines". The standard which should be employed, according to the ICAC, is one of clear abuse of discretion by the commission. The ICAC states, in part:

"The Court of Appeals requirement for the 'perfect plan' should not be imposed on an apportionment commission. Any plan is capable of improvement in some degree (although improvement in one area may result in a loss in other areas). The effect of the Court of Appeals order is to remove from the apportionment

---

[14] 1982 PA 2 added a requirement that "[i]n the second year following each federal census, precincts shall be divided pursuant to this subsection". MCL 168.661(3); MSA 6.1661(3). The inviolability of precincts under Act 261 is thus reduced.

1982] WAYNE COUNTY APPORTIONMENT—1982    293
OPINION BY BLAIR MOODY, JR., J.

commission all discretion in decision-making. The Court of Appeals opinion could result in the adoption of the last 'best' plan (mathematically speaking). The courts should not overturn an apportionment commission decision unless there is a clear abuse of discretion by that commission in applying the nonconstitutional subsidiary criteria."

# E

What standard of review should be applied when the Court of Appeals examines an apportionment plan adopted by a commission pursuant to MCL 46.404; MSA 5.359(4)? MCL 46.406; MSA 5.359(6) simply states that the Court of Appeals must determine if the plan "meets the requirements of the laws of this state". However, it is clear that the Court of Appeals has adopted a standard which would require a commission to adopt the plan which *best* meets the requirements of the laws of this state, with the law being the criteria which are set forth in MCL 46.404; MSA 5.359(4). This standard leaves very little discretion, if any, in the apportionment commission. If an individual could demonstrate, for instance, that his or her plan, while in all other respects identical to that favored by a majority of the commission, nevertheless divided fewer precincts, such a plan would qualify as the "best" plan.

We are convinced that the Legislature did not intend to so limit the discretion of the apportionment commission. Certainly the record must support the conclusion that the apportionment commission followed the guidelines in MCL 46.404; MSA 5.359(4). In *Reynolds v Sims, supra,* the United States Supreme Court, in a state legislative apportionment context, required "an honest and

good-faith effort" on the part of the states to achieve districts as nearly of equal population as is practicable. We believe this standard should also be applied when assessing the efforts of a county apportionment commission to comply with the guidelines contained in MCL 46.404; MSA 5.359(4). To require more would reduce the apportionment process to a mere mathematical exercise and would constitute an apportionment commission little more than a board of account. To require less would give rise to the evils which prompted the establishment of guidelines in the first instance.

F

Did the plans which the WCAC and the ICAC adopted demonstrate an "honest and good-faith effort" to comply with the criteria specified in MCL 46.404; MSA 5.359(4)? We would answer the question in the affirmative in the case of the WCAC's plan and in the negative in the case of the ICAC's plan.

*WCAC*

As we noted earlier in this opinion, the only two plans which received serious consideration by the WCAC were the one which it ultimately adopted (the "Holley" plan) and the plan submitted to it by its own staff (the "revised staff" plan). We conclude that the record before us clearly demonstrates that the WCAC considered all of the guidelines in their stated order of importance and made an "honest and good-faith effort" to select a plan which adhered to those criteria. Thus, the plan adopted by the WCAC "meets the requirements of the laws of this state".

## ICAC

The minutes of the meetings of the ICAC evidence a predilection on the part of the commission, understandable in view of prior court decisions, to be concerned with population equality virtually to the exclusion of all other factors. However, all 13 plans which, at one time or another, were proffered to the commission were zero deviation plans. In such a situation, it is obvious that adherence to the other guidelines in the statute should determine plan selection.

In this case, the petitioner has convincingly established that compared to three other plans the one which the commission ultimately adopted was, judged against the other guidelines, the worst of the group (if the petitioner's tests are used) or the worst or equal to the worst of the group (if the ICAC's tests are used). The Court of Appeals made a finding that the ICAC's plan was, indeed, the worst of the four. Moreover, we are not persuaded, on the basis of the record before us, that the ICAC gave adequate consideration to the guidelines of MCL 46.404(c)-(f); MSA 5.359(4)(c)-(f).

## III

The ICAC has raised three other contentions on appeal. Specifically, the ICAC alleges that the Court of Appeals erred: 1) in requiring that each plan submitted be voted on and that each commission member give reasons for his vote; 2) in requiring that the commission choose its board size at the first meeting on record; and 3) in imposing unreasonable time constraints on remand.

We agree with the ICAC that the Court of

Appeals erred in requiring a vote on all plans submitted and in requiring a statement of reasons for the vote of each commissioner. We would find such requirements to be unnecessary and unwise encroachments upon the actions of a quasi-legislative body. See *Giddings v Secretary of State,* 93 Mich 1, 8; 52 NW 944 (1892). We would therefore vacate this part of the Court of Appeals judgment.

We would find no error in the order of the Court of Appeals insofar as it required the ICAC to choose its board size at the first meeting, to adopt a new plan and to submit it within ten days, and to submit copies of all plans considered at the first two meetings. Here the Court of Appeals clearly was attempting to insure an orderly and timely procedure to be followed on remand.

## IV

The WCAC has filed a motion to strike certain issues raised in the petitioners' brief on appeal. The issues in question were raised by the petitioners as to the propriety of the Court of Appeals order. The WCAC correctly observes that the petitioners are attempting to raise these issues without ever applying for leave to appeal or for leave to appeal as cross-appellants. GCR 1963, 853. Accordingly, we would not entertain these questions.

## V

We would reverse the judgment of the Court of Appeals in *Apportionment of Wayne County Board of Comm'rs—1982.* We would affirm in part and reverse in part the judgment of the Court of Appeals in *Apportionment of Ingham County Board of Comm'rs—1982.*

WILLIAMS and RYAN, JJ., concurred with BLAIR MOODY, JR., J.

WILLIAMS, J. *(concurring with* MOODY, J.*)*. Because of the compelling necessity of urgent decision in order to accommodate the election time schedule, I concur with Justice MOODY's opinion, but reserve the right to submit a later opinion expanding my views if further reflection suggests that would be useful.